570 F.2d 439
 97 L.R.R.M. (BNA) 2606, 83 Lab.Cas. P 10,338
 Dave NEWMAN, Vincent Cassidy, Frank Gallaro, Edward Guy,
David Spira, Edward Sevilla, Aaron Bookin, John Scott, Vinny
Daniele, Raymond Hughes, Arcangel Ascencio, Alfredo Bernard,
Sigmund Barkhaus, Brent Kramer, Edward Davis, Raymond
Pelmieri, William Fairchild, Euston Stewart, John Schuster,
Edward McDonald, Joseph Bellone and Elizabeth Winiarski,
Plaintiffs-Appellees,
v.
LOCAL 1101, COMMUNICATIONS WORKERS OF AMERICA,
A.F.L.-C.I.O., Edward Dempsey, President, Robert Barbarelli,
Vice-President and Richard McLaughlin, Business Agent of
Local 1101, Communications Workers of America,
A.F.L.-C.I.O., Defendants-Appellants.
 No. 173, Docket 77-7277.
 United States Court of Appeals,
Second Circuit.
 Argued Oct. 12, 1977.
Decided Jan. 26, 1978.
 
 Michael Klein, New York City (O'Donnell & Schwartz, New York City, of counsel), for defendants-appellants.
 Amy Gladstein, Atty., Brooklyn, N.Y. (Loren Siegel, Atty., Brooklyn, N.Y., of counsel), for plaintiffs-appellees.
 Before SMITH, MANSFIELD and OAKES, Circuit Judges.
 MANSFIELD, Circuit Judge:
 
 
 1
 In this action by members of Local 1101 ("Local") of the Communications Workers of America, AFL-CIO ("CWA") against it and various of its officers alleging violation of the plaintiffs' free speech rights as union members under §§ 101(a)(2) and 609 of the Labor-Management Reporting and Disclosure Act, 29 U.S.C. § 411(a)(2) and § 529 ("LMRDA"),[1] the defendants appeal from an injunction issued on May 26, 1977, by Judge Whitman Knapp of the Southern District of New York. His order directed them to reinstate plaintiff-appellee Dave Newman as a job steward of Local 1101 and restrained them from refusing to certify or from decertifying any member of Local 1101 as a job steward because of his exercise of his rights under § 101(a)(2), LMRDA. The injunction was issued on the basis of apparently undisputed facts disclosed in affidavits submitted by the parties, without any evidentiary hearing. The central issue on this appeal is whether removal of Newman from his position as a job steward violates or threatens to violate his free speech rights or those of others as union members under the LMRDA. For the reasons stated below, we hold that it does not and reverse.
 
 
 2
 The membership of Local 1101 consists of approximately 11,000 non-supervisory employees in the Plant Department of the New York Telephone Company and in the Empire City Subway Company, who work in the Boroughs of Manhattan and the Bronx, installing, maintaining and repairing communications systems, equipment and facilities. Unlike many other local unions, Local 1101 does not act as the collective bargaining representative of its members. That function is performed by the national union, CWA in negotiations on a nation-wide basis on behalf of some 29 units, including Local 1101, with the American Telephone and Telegraph Company. Local 1101's function is to enforce the agreement negotiated by CWA, securing for its membership the benefits provided for in the agreement, and carrying out union policies and programs as directed by CWA. It recruits new members, informs and interprets for its members the applicability in differing work situations of the terms of the complicated bargaining agreement between CWA and AT&T, which has numerous provisions governing such important matters as work schedules, computation of work and travel time, overtime, night work and the like for many different work classifications. Local 1101 also serves as a liaison between CWA and union members, communicating the views of members to the union leadership and educating members as to the union's programs as well as maintaining legislative and community service committees, advising members of their rights and of available grievance procedures, and the like.[2]
 
 
 3
 According to Local's by-laws, the power to govern the union is vested in its Executive Committee, which consists of its president, three vice-presidents, secretary, and treasurer, and in its Executive Board, which consists of these six officers plus five Business Agents. The by-laws (Art. XI, Sections 4, 5) (1) authorize the Executive Committee or Executive Board to create as many "Chief Steward" and "Job Steward" positions as may be "determined necessary" to assist in carrying out the Local's functions, (2) give the Committee and Board the option of permitting the job stewards to be elected by membership work units or appointed by the Committee or Board, and (3) authorize the Committee by majority vote to remove any job steward, subject to being overruled by the Board or the membership at the next membership meeting.
 
 
 4
 Under Local 1101's by-laws a job steward is required to work under the direction of the Local's officers and to perform such duties as may be assigned to him by the Executive Board, President, Vice-President, Business Agent, or Chief Steward. The responsibilities of a job steward are outlined in detail in a 52-page booklet published by the CWA entitled "CWA STEWARD'S MANUAL." The steward's principal functions are to handle and process grievances arising on his job location, promote and maintain union membership by workers in his department, attend union meetings, explain and implement CWA policies and programs so that workers "will understand and cooperate with CWA policies," review CWA publications in order to "help (the job steward) act and speak in line with Union policy," and pass along to the Local's management its members' views and ideas with respect to CWA activities. In short, the steward acts as the Local's representative on the job, primarily concerned with enforcement of the collective bargaining agreement and secondarily as a link that serves as the Local's eyes and ears.[3]
 
 
 5
 The management of Local 1101 chose to create almost 1,000 stewardships for its 11,000 members and to permit each steward to be elected by the work force in the building or unit where he was employed, rather than appointed. One of these stewards is plaintiff-appellee Dave Newman, who was chosen in September 1975 as one of four stewards by some 90 framemen employed in the 104 Broad Street building in lower Manhattan. After joining the Local in 1971 he had actively worked for more democratization of the Local and in opposition to its leadership. Toward this end he wrote, published and distributed leaflets critical of the Local's management and policies and spoke in a similar vein at members' meetings.
 
 
 6
 On December 2, 1976, the Executive Committee of Local 1101, purportedly acting pursuant to Article XI, Section 5(B) of the Local's by-laws, voted to decertify, or remove, Newman as a job steward on the ground that at a December 1, 1976, meeting of union members at 104 Broad Street he had engaged in disruptive conduct which prevented the President of Local 1101 from engaging in a discussion with members concerning CWA's preparation for its upcoming negotiation with Bell system representatives, scheduled to begin in February, 1977, regarding the terms of a new collective bargaining agreement to replace the existing one, which would expire in August, 1977.
 
 
 7
 Some of the facts regarding Newman's conduct at the December 1, 1976, meeting are in dispute. According to the defendants, Newman interrupted Edward Dempsey, the President of the Local, when he attempted to speak to them and to elicit their views about certain key matters expected to be the subject of CWA-Bell bargaining, making any useful interchange impossible. Newman, on the other hand, asserts that the meeting was conducted in an orderly fashion, with Dempsey becoming upset and agitated when Newman presented certain resolutions previously adopted by workers at 104 Broad Street with respect to preparations for collective bargaining. Despite the existence of these disagreements, certain facts are not disputed. Newman vigorously opposed the Local's policy and program for bargaining and supported a militant approach, which would require the CWA to mobilize its membership for a strike to be called unless Bell agreed to a 32-hour week at 40 hours pay or a no lay-off clause. Furthermore, Newman advocated the organization of monthly lunch-hour rallies of workers at various Bell buildings over the five-month period preceding expiration of the existing contract to mobilize union opposition to any management proposal that did not meet this, and other, minimum demands. More facts regarding Newman's opposition to the Local's policies appear in the discussion below.
 
 
 8
 On February 6, 1977, invoking federal jurisdiction under LMRDA § 102, 29 U.S.C. § 412, the plaintiffs commenced the present action seeking Newman's reinstatement and an order enjoining the defendants from disciplining any members of Local 1101 for exercise of rights to which they are entitled under the LMRDA. Two days later plaintiffs moved for preliminary relief along the same lines, based on the affidavits of Newman and several of his co-workers at 104 Broad Street. In opposition, defendants filed affidavits of Edward Dempsey, President of Local 1101, and Anthony Vizzari, chief steward of workers at 104 Broad Street and at Bell's Central Office at 60 Broad Street, who was in charge of 10 to 14 job stewards, including Newman. On March 10, 1977, the defendants filed their answer denying violation of LMRDA and interposing affirmative defenses to the effect that removal of Newman as a job steward was justified and that federal jurisdiction was lacking.
 
 
 9
 By written opinion filed on May 27, 1977, Judge Knapp granted the requested preliminary injunction to the extent of ordering Newman's reinstatement and restraining the defendants from refusing to certify or from decertifying any member as a job steward because of his exercise of his rights under the LMRDA. Although Judge Knapp found "a divergence of views" in the Dempsey and Newman affidavits as to why Newman was removed from his position as a job steward, he concluded on the basis of certain uncontradicted statements in affidavits of some of Newman's fellow-workers that Newman had been decertified because of an article published by him in the November-December issue of The Broad Street News, a publication written by and for members at 104 Broad Street, which opposed the Local management's policies, "his repeated expression of views in opposition to the (Local 1101) leadership," and his sponsorship of the resolutions adopted on November 10, 1976, by the members at 104 Broad Street. Judge Knapp then concluded that, although the defendants' conduct was not actionable under § 101(a)(1) of the LMRDA, 29 U.S.C. § 411(a)(1), which governs members' rights to nominate and vote for candidates in free elections, plaintiffs were entitled to preliminary relief under § 101(a)(2) of the LMRDA, 29 U.S.C. § 411(a)(2), since they were "likely to succeed in establishing that Newman was decertified solely because of the views he repeatedly expressed in his article and at the December, 1976, Broad Street meeting" and "that the defendants have in effect rendered Newman and others who express similar views in opposition to the leadership ineligible to take the position of job steward to which they have been elected."
 
 
 10
 In the district court's view such decertification constituted "unlawful discipline within 29 U.S.C. § 529 in retaliation for his exercise of his rights under § 411(a)(2)." Judge Knapp further concluded that "there remains nothing in the facts before us to suggest that he (Newman) is in any way unqualified to perform the functions of a steward" and that other plaintiffs, including stewards and non-stewards, were likely to succeed in showing that the decertification of Newman as a job steward had "chilled their speech in violation of 29 U.S.C. § 411(a)(2) and § 529." From this preliminary injunction defendants have appealed.
 
 DISCUSSION
 
 11
 The basic principles by which we are governed are rather simple and straightforward. Title I of LMRDA, 29 U.S.C. §§ 411, et seq., entitled "BILL OF RIGHTS OF MEMBERS OF LABOR ORGANIZATIONS," guarantees to "every member of a labor organization" the right of free speech and assembly, subject to the union's right to enforce reasonable rules governing its members' responsibility toward it and provided its members refrain from conduct interfering with the union's performance of its obligations. 29 U.S.C. § 411(a)(2). Section 609 of LMRDA, 29 U.S.C. § 529, makes it unlawful for any union or its officers or representatives to "expel, or otherwise discipline any of its members for exercising any right to which he is entitled under the provisions of this chapter." The statutes were "designed to protect the rights of union members to discuss freely and to criticize the management of their unions and the conduct of their officers." Salzhandler v. Caputo, 316 F.2d 445, 448-49 (2d Cir. 1963) (emphasis added).
 
 
 12
 Despite the apparent simplicity of these statutory provisions, the precise extent of the protection the Act affords to union members in their capacity as union officers or employees is sometimes difficult to discern. As a member of the union a union official or employee, of course, enjoys the rights guaranteed by LMRDA, Schonfeld v. Penza, 477 F.2d 899, 904 (2d Cir. 1973); Bradford v. Textile Workers, Local 1093, 563 F.2d 1138 (4th Cir. 1977), 96 LRRM 2690, and his suspension or removal in reprisal for his exercise of his free speech rights as a member would violate the Act, Miller v. Holden, 535 F.2d 912 (5th Cir. 1976); Wood v. Dennis, 489 F.2d 849 (7th Cir. 1973), cert. denied, 415 U.S. 960, 94 S.Ct. 1490, 39 L.Ed.2d 575 (1974). But see Sheridan v. United Brotherhood of Carpenters, Etc., 306 F.2d 152 (3d Cir. 1962), and Martire v. Laborers' Local Union 1058, 410 F.2d 32, 35 (3d Cir. 1969). On the other hand, a union official or employee also has certain duties toward the organization he represents and its leadership, which usually (as in this case) has been elected by the members according to democratic procedures, and has been entrusted with the responsibility for supervision of the union's affairs, including the formulation of policies, plans and programs believed to be in the best interests of the membership. See Wambles v. International Bro. of Teamsters, Chauffeurs, 488 F.2d 888 (5th Cir. 1974). Although a person is free as a union member to criticize mercilessly his union's management and its policies, once he accepts a union position obligating him fairly to explain or carry out the union's policies or programs, he may not engage in conduct inconsistent with these duties without risking removal as an official or employee (but not as a union member) on the ground that his conduct precludes his effective representation of the union. Unless the management of a union, like that of any other going enterprise, could command a reasonable degree of loyalty and support from its representatives, it could not effectively function very long. To obligate union leadership to tolerate open defiance of, or disagreement with, its plans by those responsible for carrying them out, would be to invite disaster for the union.
 
 
 13
 The Local 1101 job steward, unlike other members of the union, wears a second hat, that of an agent of the union. While he is not precluded from exercising his free speech rights as a member, he is also under a duty as a representative of the union's management to cooperate with it and to implement its directives. He may not, while acting as the union's agent, sabotage or subvert its policies in the name of free speech. Similarly the union's leadership, although entitled to establish union policies and to demand reasonable adherence to them by its agents, may not discipline a job steward for the purpose of suppressing or chilling his exercise of free speech rights or that of others as members.
 
 
 14
 In this tension between conflicting rights and duties of the union and its agents the balance to be struck depends on whether the union representative's exercise of his free speech rights may reasonably be viewed as impairing his ability to function effectively as a representative of the union's management. If so, the union may remove him, provided he remains free as a member openly to criticize the union's leadership and its policies without reprisal. We do not believe that Congress intended Title I of LMRDA to insulate union officials, employees, or agents from removal, or to permit a union representative who disagrees with its leadership to freeze himself in office on First Amendment grounds.
 
 
 15
 The inquiry in each case, therefore, must be to determine whether a member's opposition to the union's programs or policies may be reasonably viewed as precluding him from acting effectively as its representative, and whether his removal from his official position would tend to prevent him or others from exercising their rights as members under Title I of LMRDA. The inquiry requires a close analysis of the nature of the union position in question, the extent of the allegedly unlawful discipline, and the motivation behind the removal. As Judge Oakes pointed out in Schonfeld, supra :
 
 
 16
 "We by no means suggest . . . that the free speech rights of union members are threatened or infringed upon every time a political dispute occurs in a union and the dissident members interpret some action by union officials as a threat." 477 F.2d at 903.
 
 
 17
 Only where there is clear and convincing proof that the union action in this case the decertification of Newman as a job steward was "part of a purposeful and deliberate attempt by union officials to suppress dissent within the union," 477 F.2d 904, should the federal court act under LMRDA. Otherwise we are bound to adhere to our longstanding policy against intervention in the internal affairs of unions, which are best "left to the officials chosen by the members to manage those operations except in the very limited instances expressly provided by the Act." Gurton v. Arons, 339 F.2d 371, 375 (2 Cir. 1964).
 
 
 18
 Turning to the present case, the district court in essence took the view that, absent proof of disruptive conduct on Newman's part, Local 1101's management would be prohibited by Title I from decertifying him as a job steward because of his expressed opposition to its policies which he was under a duty to administer and explain to members, even though this might have adversely affected his effectiveness as a representative of the Local's management. We disagree. In our view plaintiffs were required to show that the purpose was, or effect of decertifying Newman as a job steward would be, to inhibit or stifle his exercise of free speech rights as a union member. If not, the Local leadership was not precluded from discharging him. Since there is no showing that the decertification had any such purpose or effect, it must be upheld.[4]
 
 
 19
 Among his other duties as a Local 1101 job steward Newman was obligated by Article XI, Section 5, of its by-laws to work "under the direction of" its officers and business agents, and according to the "CWA Steward's Manual" "to carry out the Union's general policies in dealing with the company," "to speak in line with Union policy," "to educate workers so they . . . cooperate with CWA policies" and to function as "CWA's official representative right on the job," acting as "the pipeline for dissemination of information and union policy." Accepting Newman's own version of the events in issue, the record is clear that he was strongly indeed militantly opposed to Local 1101's basic policies, and that he broadcast his opposition as widely as he could to the membership. On the one side, the Local's management, anticipating the expiration on August 6, 1977, of the collective bargaining agreement between CWA and the Bell System companies and the negotiation of a new contract, favored relatively calm and dispassionate negotiations with Bell looking toward obtaining from Bell by peaceful means provisions for retraining programs in order to alleviate lay-offs caused by technological changes in the Bell system, improvements in the existing pension plan that would take into account increases in the cost of living, a possible reduction in the work week, and increases in vacation and personal leave periods. Newman, on the other hand, favored a commitment to, and advance organization of the entire union for, a nation-wide strike and "rejection movement," unless Bell agreed to a contract meeting certain minimum demands, including "job security," i. e., a 32-hour week at 40 hours pay, or a no lay-off clause. Toward this end Newman induced the employees at 104 Broad Street, where he functioned as Local 1101 job steward, to adopt a resolution along these lines, which in substance called for a strike, preceded by monthly pre-strike demonstrations outside Bell System buildings during the negotiation period, which was expected to last from February to August, 1977.[5]
 
 
 20
 It is undisputed that when Edward Dempsey, President of Local 1101, appeared with other union officers at a meeting of 104 Broad Street employees on December 1, 1976, to discuss the union's proposed program and policy for the upcoming negotiations with Bell, Newman distributed copies of the November-December 1976 edition of The Broad Street News, a publication which Newman and certain other 104 Broad Street employees had periodically published beginning in May, 1976. The November-December issue contained not only a copy of the resolution but a column entitled "Contract Talk" written by Newman deploring the apathy of the Local's membership toward union meetings, which stated:
 
 
 21
 "But apathy comes from a feeling of powerlessness, from a lack of involvement. It comes from bullshit tapes, from an underutilized Generator, from too few meetings, & from a policy of no new business, no discussions, no decision-making apparatus, no democracy, & no means of participation by the rank & file.
 
 
 22
 "If we are to force the co. to give us a good contract, this trend must be reversed. The resolutions we passed on Nov. 10 are a good start. Now we have to talk to friends & stewards in other districts & get them to take similar actions. And we have to show Dempsey that we're angry & that we mean business. If the union is not organized, and if the rank & file is not actively participating, any kind of contract demands about job security will be just hot air, & you better believe the co. knows it."
 
 
 23
 Both Dempsey and Newman spoke at the December 1, 1976, lunch-hour meeting, the former in favor of the negotiating policy adopted by the Local's leadership and the latter in opposition to that policy, expressing his endorsement of the November 10 resolution. On the following day, December 2, 1976, Newman was decertified by the Executive Committee as a job steward.
 
 
 24
 As Judge Knapp noted, an issue was presented by the conflicting affidavits regarding the reason for Newman's decertification, with Dempsey swearing that the action was taken because Newman had disrupted the meeting, making it impossible for Dempsey to present the Local's program and to elicit the views of the employees present, and Newman taking the position, on the basis principally of statements attributed to certain Local officers at the close of the December 1, 1976, meeting, that he was decertified because of his publication of the resolution, The Broad Street News article, and "his repeated expression of views in opposition to the leadership." We find it unnecessary to resolve this factual issue for the reason that even if Newman's version is accepted, it is clear that his removal was justified on the ground that his conduct precluded him from functioning effectively as an agent of the Local management and because, in light of all the circumstances, neither the purpose nor effect of the decertification was to chill or inhibit his free speech rights as a union member.
 
 
 25
 The inability or unwillingness of Newman to explain the Local's program and policy to employees in a manner designed to enlist their cooperative understanding of it, much less himself to implement that policy, is obvious. As a vigorous opponent of that policy he favored eradication, rather than promotion or even objective criticism, of the policy. Under the circumstances he could not be expected to explain it fairly to the membership. In short, his political interests were incompatible with some of his principal duties as a steward.
 
 
 26
 The record is equally clear that neither the purpose nor the effect of decertifying Newman as a job steward was to discourage his exercise of his free speech rights as a member. Following decertification he was entitled to all of the rights of union membership, including full participation in union meetings, candidacy for union office, and the right to speak out in opposition to the management, to write and distribute any publication (including The Broad Street News ) and to nominate and vote for others to replace the union officers with whom he disagreed. The union has not interfered with Newman's exercise of any of these protected rights. He has not been suspended or expelled from membership.[6] Nor has he been fined or disciplined as a member. His only monetary loss from decertification borders on the nominal a payment of $20 per union meeting to cover his expenses for each of four such meetings held annually.
 
 
 27
 That decertification as a job steward could not reasonably be expected to chill Newman's exercise of his LMRDA rights is also evidenced by his own earlier relations with Local 1101's management which, to put it mildly, had been turbulent. Beginning in 1971, when he joined Local 1101, Newman had been an active member of a group within the Local called "United Action" which advocated greater democratization of the Local. Toward this end he distributed the group's periodic newsletter in which he criticized the Local and spoke at membership meetings in opposition to the policies of its management. In 1973 he became a job steward for framemen employed at the World Trade Center, where he worked, but was decertified and removed by Local 1101's management, allegedly because of distribution of his group's leaflets near a union voting place and refusal to assist in counting ballots but, according to Newman, because of his criticism of the Local's leadership and distribution of leaflets opposing its views on critical issues. Thereafter, although chosen again as a job steward by his co-workers, he was denied certification. In 1974 he continued his opposition activities as a United Action representative and in March, 1975, unsuccessfully ran for election as a Business Agent, urging greater democracy within the Local. In September 1975 he once again was chosen as one of four job stewards for some 90 framemen at the 104 Broad Street building, receiving the highest vote of seven candidates. After a six-week delay he was this time certified by the Local's management.
 
 
 28
 For present purposes the significant fact is that despite a prior decertification as a job steward and the union leadership's prior refusal to certify him after election to that office, Newman continued to exercise his free speech rights as a union member, conducting vigorous campaigns for greater democratization in opposition to Local 1101's incumbent leadership. In view of this unique record, in which identical conduct by the defendants had not deterred Newman or any other union members from exercising their rights under LMRDA, we do not believe that judicial intervention is necessary or justified.
 
 
 29
 Although Newman was elected to the position of job steward by his fellow workers at the 104 Broad Street building, he did not thereby gain any special status or tenure of special significance, the forfeiture of which might adversely affect his rights as a member. Under Local 1101's by-laws the Executive Committee and Executive Board retain the unrestricted power to appoint as many stewards as they wish and to remove them at will. The Local's use of an election to select job stewards, presumably in the interest of obtaining candidates for the position who would enjoy the greatest confidence and popularity among their co-workers, does not preclude it from removing a steward who, because of his opposition to the union's leadership and policies, will not in the view of the Local's elected officials act in the best interests of the membership as a whole.
 
 
 30
 Accordingly, the order of the district court granting preliminary injunctive relief is reversed and the case is remanded for further proceedings not inconsistent with this opinion.
 
 
 
 [1]
 29 U.S.C. § 411(a)(2) states:
 "(2) Freedom of speech and assembly. Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings: Provided, That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations."
 29 U.S.C. § 529 states:
 "It shall be unlawful for any labor organization, or any officer, agent, shop steward, or other representative of a labor organization, or any employee thereof to fine, suspend, expel, or otherwise discipline any of its members for exercising any right to which he is entitled under the provisions of this chapter. The provisions of section 412 of this title shall be applicable in the enforcement of this section."
 
 
 [2]
 In 1976, for instance, approximately 5,000 grievances were processed by Local 1101
 
 
 [3]
 Although the term "job steward" does not appear in the LMRDA, the statute defines the term "shop steward," along with the terms "officer, agent, or other representative" as including "elected officials and key administrative personnel, whether elected or appointed (such as business agents, heads of departments or major units, and organizers who exercise substantial independent authority)". This category is contrasted with "salaried nonsupervisory professional staff, stenographic, and service personnel." 29 U.S.C. § 402(q). From this it may be concluded a job steward would fall within the category of union administrative personnel
 
 
 [4]
 Since the district court acted entirely on the basis of a written record, without any evidentiary hearing, we are in as good a vantage point as it to appraise the sufficiency of the proof. United States ex rel. Lasky v. LaVallee, 472 F.2d 960, 963 (2d Cir. 1973)
 
 
 [5]
 The resolution Newman presented to Dempsey at the meeting of December 1, 1976, stated:
 "With contract expiration and a possible strike approaching, the CWA membership of 104 Broad St. calls on President Dempsey and the 1101 Executive Committee to immediately begin serious preparations for mobilizing the membership of the Local and for building a national rejection movement. We call on President Dempsey
 1) to commit himself to call for the rejection of any proposed contract settlement that does not include job security, i. e., a 32-hour week at 40-hours pay, or a no-layoff clause; to contact other local presidents and get them to make the same commitment; and to publish all such pledges, with names, in the 1101 Generator
 2) to commit himself, that in the event of a strike, he will work to keep our bargaining unit from returning to work until all other bargaining units have ratified their settlements, provided that a sufficient number of other bargaining units have made similar commitments; to contact other local presidents and get them to make the same commitment; and to publish all such pledges and names in the Generator
 3) not less than 6 months prior to contract expiration, to form a local-wide strike committee, composed of the Chief Steward body and of one member elected at large from each district; to make this committee responsible for preparing, organizing, and running a strike by concerning itself with legal and financial assistance, publicity, communications, operator organizing, flying pickets, etc.
 4) not less than 5 months prior to contract expiration, to organize monthly lunch-hour rallies at AT&T and NYTel headquarters and buildings
 5) to immediately urge all districts to begin holding regular monthly district membership meetings, and
 6) to publish this and any future district-wide resolutions in the Generator."
 
 
 [6]
 In this respect the present case is clearly distinguishable from and consistent with Salzhandler v. Caputo, 316 F.2d 445 (2d Cir. 1963), where we reversed the dismissal of a union official's complaint charging that he had been unlawfully disciplined in violation of § 101(a)(2), LMRDA, 29 U.S.C. § 411(a)(2) because of allegedly libelous statements to the effect that other officers of a union had stolen or embezzled its funds. Aside from the fact that the appellant's ability to function effectively as Financial Secretary of the union there was not shown to have been adversely affected by his statement, the discipline clearly inhibited his exercise of his free speech rights as a union member, since, in addition to being removed from office, he was for five years stripped of his most important rights as a member, including the right to participate in union affairs, to attend or speak at union meetings, and to vote on any matter. Newman, in contrast, continues to enjoy all of these rights. See also Schonfeld v. Penza, supra, 477 F.2d 899 (union member's removal from office and disqualification as a candidate for any elective union position for five years held a violation of LMRDA)