821 F.2d 95
 125 L.R.R.M. (BNA) 2766, 55 USLW 2699,
106 Lab.Cas. P 12,422
 Walter KUDLA, Petitioner,
John Kuebler and Richard Van Romer, Intervenors,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
Local 282, International Brotherhood of Teamsters,
Chauffeurs, Warehousemen and Helpers of America, Intervenor.
 No. 792, Docket 86-4154.
 United States Court of Appeals,
Second Circuit.
 Argued Feb. 9, 1987.
Decided June 8, 1987.
 
 Daniel E. Clifton, New York City (Clifton & Schwartz, New York City, of counsel), for petitioner.
 John Kuebler (Richard Van Romer), pro se.
 Allen R. Ferguson, Jr., Washington, D.C. (Peter Winkler; James Darby; John Irvesdale, Executive Secretary, N.L.R.B.; Rosemary M. Collyer, Gen. Counsel, N.L.R.B.; John E. Higgins, Jr., Deputy Gen. Counsel, N.L.R.B.; Robert E. Allen, Associate Gen. Counsel, N.L.R.B.; Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B.; Washington, D.C., of counsel), for respondent.
 Eugene S. Friedman, New York City (Franklin K. Moss, Stephen Presser, Cohen, Weiss and Simon, New York City, of counsel), for intervenor Local 282, Intern. Broth. of Teamsters, Chauffeurs, Warehousemen and Helpers of America.
 Before KEARSE, WINTER and MINER, Circuit Judges.
 MINER, Circuit Judge:
 
 
 1
 Petitioner Walter Kudla and intervenors John Kuebler and Richard Van Romer seek review of an order by the National Labor Relations Board (the "NLRB" or "Board") modifying the findings and recommended order of the Administrative Law Judge (the "ALJ"). The NLRB ruled that Local 282, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (the "union" or "Local 282") did not violate the National Labor Relations Act, 29 U.S.C. Secs. 151 et seq. (1982 & Supp. III 1985) (the "Act" or "NLRA"), by refusing to refer petitioner, a dissident union member, to a working teamster foreman ("WTF") position because the union considered him to be insufficiently loyal. The NLRB reasoned that such discrimination against a dissident union member merely was incidental to the furtherance of legitimate union objectives because the WTF was analogous to a shop steward and responsible for administration of the collective bargaining agreement. The NLRB also ruled that there was no evidence that the loyalty standard had been applied in an arbitrary and capricious manner.
 
 
 2
 We uphold the Board's determination that loyalty is an appropriate consideration for referral to a position that entails contract administration duties. We remand, however, for an evidentiary hearing on whether the loyalty standard was applied to petitioner in an arbitrary and capricious manner.
 
 BACKGROUND
 
 3
 Local 282 represents chauffeurs, drivers and warehousemen in the construction industry in New York City, and has negotiated separate collective bargaining agreements with two associations of employers engaged in heavy construction and high-rise construction--the General Contractors Association ("GCA") and the Building Contractors Association ("BCA"). Under the terms of the contracts, Local 282 has the exclusive right to refer a working teamster foreman for employment on any construction site where the total gross cost of construction is $5,000,000 or more. Joint App. at 421, 424. The employer may accept or reject a referral to the WTF position but, upon rejection, the union refers another candidate. Id. at 418.
 
 
 4
 During the period of construction, a WTF works at the job site for which he is hired. In addition to checking truck deliveries to the site and routing trucks to the appropriate location, a WTF
 
 
 5
 shall handle all grievances involving the application of this Agreement on the site, shall coordinate safety efforts relating to Teamsters on the site, and shall be allowed a reasonable amount of time to conduct union business consistent with the concept that he is a working Teamster.
 
 
 6
 Id. at 421, 426.
 
 
 7
 On April 2, 1981, union member Ted Katsaros wrote to Robert Sasso, then Secretary-Treasurer of Local 282, requesting both a referral to a WTF position and a list of other applicants awaiting referral to WTF positions. On May 12, 1981, union member Walter Kudla wrote a similar letter requesting referral and information. They received virtually identical letters in response, stating that they had been "added to that list" but containing no information regarding the length of the list or the names of other applicants. On May 6, 1981, Katsaros sent another letter to Sasso, requesting both the names of applicants on the list and the names of applicants who had been referred in the preceding six months. By letter dated May 19, 1981, Sasso responded that "[WTF] hiring is not done through a union hiring list." Id. at 468. At about the same time, Kudla met Sasso in the union office, and again requested referral to a WTF position. Sasso told Kudla that his name was on the list, but refused to show Kudla either a copy of the list or a copy of the contract. Neither Katsaros nor Kudla was referred to a WTF position.
 
 
 8
 In August of 1981, Katsaros filed an unfair labor practice charge against the union, in which Kudla subsequently joined, claiming that the union's refusal to refer him to the WTF position was in retaliation for his opposition to the union leadership. Katsaros and Kudla, both long-time Local 282 members, were active union dissidents, who supported opposition candidates in union elections through a group called "FORE" (Fear of Reprisal Ends), and who ran unsuccessfully for union office on the FORE slate between 1966 and 1981. Additionally, Katsaros had prevailed in several suits against the union: Expelled from the union in 1978, he successfully appealed to the NLRB, which found his expulsion to be in retaliation for his opposition to the incumbent union officials. Frank Mascali Constr. Co., 251 N.L.R.B. 219 (1980), enf'd, 697 F.2d 294 (2d Cir.), cert. denied, 459 U.S. 988, 103 S.Ct. 341, 74 L.Ed.2d 383 (1982). He also succeeded in an action against John Cody, a former Local 282 president, Robert Sasso and others, in their capacities as trustees of the union pension trust fund. As a result, those individuals were removed as trustees. Katsaros v. Cody, 744 F.2d 270 (2d Cir.), cert. denied, 469 U.S. 1072, 105 S.Ct. 565, 83 L.Ed.2d 506 (1984).
 
 
 9
 In response to the unfair labor practice charge, the NLRB issued a complaint alleging that Local 282 violated sections 8(b)(1)(A) and 8(b)(2) of the Act, 29 U.S.C. Secs. 158(b)(1)(A), 158(b)(2) (1982), by discriminating and causing employers to discriminate against union dissidents in referrals for WTF positions. The General Counsel of the NLRB, on behalf of the charging parties, subpoenaed various records concerning individuals actually referred by the union to those positions. The union moved to revoke the subpoena and the ALJ granted the motion.
 
 
 10
 At a hearing before the ALJ, Sasso, now the President of Local 282, testified that a WTF is responsible for enforcing the contract on the job site, for representing union members in on-site grievances and for monitoring on-site safety problems. He also testified that he did not refer Katsaros or Kudla to WTF positions because he believed they were not sufficiently loyal to the union leadership.
 
 
 11
 The ALJ found that "the sole reason why both individuals were denied an opportunity to serve as WTF's [sic] was because of their activities ... against the administration of Respondent Union." Joint App. at 23. The ALJ concluded that "a union cannot discriminate ... for invidious and illegitimate reasons." Id. at 24. However, because he determined that consideration of loyalty for a WTF referral was in itself discriminatory, he deemed it unnecessary to hear evidence on how the union applied the loyalty standard. The ALJ also concluded that because a union has an obligation to deal fairly with employee requests for job referral information, an employee is entitled to access to job referral lists to determine his relative position on the list and thereby protect his referral rights. Therefore, the ALJ found that both the union's failure to furnish information regarding the WTF referral list and its failure to refer Katsaros and Kudla to WTF positions were unfair labor practices violative of sections 8(b)(1)(A) and 8(b)(2) of the Act. The ALJ recommended that Local 282 be ordered to maintain the WTF referral system in a non-arbitrary manner, and to compensate Katsaros and Kudla for any lost earnings due to the discrimination.
 
 
 12
 The NLRB modified the ALJ's findings and recommended order. 280 N.L.R.B. No. 86 (1986). Although the NLRB agreed that the union's refusal to provide information about the referral system violated the Act, it ruled that the union's refusals to refer Katsaros and Kudla were justified. Analogizing the WTF to a shop steward, the Board reasoned that the union legitimately could consider loyalty to union incumbents as a selection criterion for the position because the WTF was responsible for administering the grievance provisions of the collective bargaining agreement on the job site. Significantly, the Board cited the lack of evidence before the ALJ that the union applied the loyalty standard arbitrarily, despite the fact that the ALJ had excluded such evidence.
 
 
 13
 Kudla now petitions this court for review; Katsaros has since been referred to a WTF position. Kudla and intervenors John Kuebler and Richard Van Romer, also union dissidents who applied but were not referred to WTF positions, contend that: (1) because Local 282 maintains an exclusive hiring hall for WTF positions, it cannot discriminate in its referrals on the basis of loyalty where it has not been shown that loyalty is necessary for effective functioning as a WTF; and, (2) if loyalty is an appropriate factor to be considered, the NLRB erred by refusing to consider evidence that the union applied that selection criterion in an arbitrary and capricious manner.
 
 DISCUSSION
 
 14
 The primary issue before us is whether, when a union has an exclusive right of referral to an employment position that includes contract administration duties, the union may consider loyalty to union leadership as a factor for selecting the union member to be referred. In determining that issue we are constrained to accord substantial deference to the NLRB's factual findings and its interpretation of the NLRA. Ford Motor Co. v. NLRB, 441 U.S. 488, 497, 99 S.Ct. 1842, 1849, 60 L.Ed.2d 420 (1979). "The rule which the Board adopts is judicially reviewable for consistency with the Act, and for rationality, but if it satisfies those criteria, the Board's application of the rule, if supported by substantial evidence on the record as a whole, must be enforced." Beth Israel Hosp. v. NLRB, 437 U.S. 483, 501, 98 S.Ct. 2463, 2473, 57 L.Ed.2d 370 (1978); see NLRB v. Niagara Mach. & Tool Works, 746 F.2d 143, 148 (2d Cir.1984) (Board's construction of Act must be upheld if "reasonably defensible"); Local 259, UAW v. NLRB, 776 F.2d 23, 26 (2d Cir.1985) (Board's factual findings conclusive if "supported by substantial evidence on the record as a whole"). We note that the NLRB is free to draw its own conclusions from the record developed before the ALJ. Interior Alterations, Inc. v. NLRB, 738 F.2d 373, 376 (10th Cir.1984); Paintsmiths, Inc. v. NLRB, 620 F.2d 1326, 1329 (8th Cir.1980).
 
 
 15
 Section 8(b)(1)(A) of the NLRA provides that it is an unfair labor practice for a union to restrain or coerce employees in the exercise of their rights under section 7 of the Act. 29 U.S.C. Sec. 158(b)(1)(A). Section 7 guarantees, inter alia, the right to engage in intra-union activity in opposition to the incumbent union administration. See National Maritime Union v. NLRB, 423 F.2d 625, 626 (2d Cir.1970). Section 8(b)(2) prohibits a union from causing an employer "to discriminate against an employee in violation of subsection (a)(3)," 29 U.S.C. Sec. 158(b)(2), which in turn makes it an unfair labor practice for an employer "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." 29 U.S.C. Sec. 158(a)(3). These sections have been interpreted to prohibit union conduct that discriminates against employees on the basis of union membership or internal union activity. Radio Officers' Union v. NLRB, 347 U.S. 17, 40-42, 74 S.Ct. 323, 335-37, 98 L.Ed. 455 (1954). However, such discrimination must be more than incidental: Union actions furthering a legitimate union interest, although simultaneously encouraging union activity, are not prohibited. NLRB v. Niagara Mach. & Tool Works, 746 F.2d 143, 147 (2d Cir.1984) (citing NLRB v. Great Dane Trailers, Inc., 388 U.S. 26, 33-34, 87 S.Ct. 1792, 1797-98, 18 L.Ed.2d 1027 (1967)); NLRB v. Milk Drivers & Dairy Employees, Local 338, 531 F.2d 1162, 1166-67 (2d Cir.1976); 48 Am.Jur.2d Labor & Labor Relations Sec. 1180, at 938 (1979).
 
 
 16
 Petitioner maintains that because the union runs an exclusive hiring hall for WTF positions--approximately 146 jobs at the time of the hearing--discrimination in those referrals, motivated by petitioner's dissident activities, is an unfair labor practice. Petitioner relies on cases in which unions refused to refer individuals to jobs because of their intra-union political activities. See NLRB v. General Truckdrivers, 778 F.2d 207, 212-14 (5th Cir.1985); Carpenters Union Local No. 25 v. NLRB, 769 F.2d 574, 580-81 (9th Cir.1985); International Longshoremen's Ass'n, Local 1408 v. NLRB, 705 F.2d 1549, 1552-53 (11th Cir.1983); Fruin-Colnon Corp. v. NLRB, 571 F.2d 1017, 1019-21 (8th Cir.1978); NLRB v. Hoisting & Portable Eng'rs, 456 F.2d 242, 243 (1st Cir.1972). Respondent counters that because the WTF is responsible for on-site contract administration and the handling of employee grievances, the union has a legitimate interest in referring "loyal" members to the WTF position, and that any discrimination is therefore incidental. See Great Dane Trailers, 388 U.S. at 33-34, 87 S.Ct. at 1797-98.
 
 
 17
 The operation of an exclusive hiring hall (wherein an employer may hire only from union referrals) by a union is not a per se violation of the Act. Local 357, Int'l Bhd. of Teamsters v. NLRB, 365 U.S. 667, 675-76, 81 S.Ct. 835, 839-40, 6 L.Ed.2d 11 (1961); NLRB v. Local 138, Int'l Union of Operating Eng'rs, 385 F.2d 874, 877 (2d Cir.1967), cert. denied, 391 U.S. 904, 88 S.Ct. 1653, 20 L.Ed.2d 418 (1968). However, it presents a union with the opportunity to engage in "invidious discrimination" by giving "preference to those union members who are most zealous in their attendance at meetings or in their support of the incumbent officials," R. Gorman, Labor Law: Unionization and Collective Bargaining 665 (1976), and therefore the operation of an exclusive hiring hall is subject to scrutiny. See NLRB v. Local 138, 385 F.2d at 877. In the discussion that follows, we bear in mind that whether a hiring hall practice is discriminatory and violative of the Act is a determination that Congress has entrusted in the first instance to the Board, Farmer v. United Bhd. of Carpenters & Joiners, 430 U.S. 290, 303 n. 12, 97 S.Ct. 1056 n. 12, 51 L.Ed.2d 338 (1977) (citing International Bhd. Local 357, Teamsters v. NLRB, 365 U.S. 667, 81 S.Ct. 835, 6 L.Ed.2d 11 (1961)), and is entitled to considerable deference, Ford Motor Co. v. NLRB, 441 U.S. at 497, 99 S.Ct. at 1849.
 
 
 18
 The Board's conclusion that the union's hiring hall practices are not discriminatory was supported by its finding that WTFs are the equivalent of traditional shop stewards. See Local 259, UAW v. NLRB, 776 F.2d 23, 26 (2d Cir.1985). The contract provides that a WTF is to "handle all grievances involving the application of [the contract] on the site, ... [and] coordinate safety efforts relating to Teamsters on the site." Joint App. at 421. Furthermore, the employer must allow the WTF "a reasonable amount of time to conduct Union business" and must treat the WTF "as a Shop Steward for purposes of the discharge clause." Id. Sasso's testimony directly supports the Board's finding that the WTF is responsible for contract enforcement and for grievance representation on the site. Id. at 179-81, 324-26. In addition, Kudla described the WTF as a "high-rise shop steward." Moreover, that shop stewards do not visit WTF-manned construction sites, id. at 180-81, supports the conclusion that the WTF performs the traditional duties of a shop steward. Finally, the Board's determination accords with its holding in Local 282, Int'l Bhd. of Teamsters, 262 N.L.R.B. 528 (1982), that WTFs are agents of Local 282 for purposes of the Act's restraints on picketing:
 
 
 19
 [D]espite the title of Working Teamster Foremen, the people holding these positions perform the functions of traditional shop stewards. Thus, the collective bargaining agreement between the Union and the [employer] is explicit in investing this category of employee with the right and authority to administer the collective bargaining agreement on behalf of the Union.
 
 
 20
 Id. at 541.
 
 
 21
 Petitioner relies on cases in which the union could claim no legitimate interest in appointing a loyal union member to a particular job because the union's referral decisions were unrelated to effective on-site contract administration. See, e.g., General Truckdrivers, 778 F.2d 207; Carpenters Union Local No. 25, 769 F.2d 574; Fruin-Colnon Corp., 571 F.2d 1017. However, those cases are inapposite inasmuch as at issue here is the selection of the union representative--a shop steward--who is responsible for contract administration.[1]
 
 
 22
 As a general rule, unions are vested with the right to select their own representatives for collective bargaining, FitzSimons Mfg. Co., 251 N.L.R.B. 375 (1980), aff'd per curiam, 670 F.2d 663 (6th Cir.1982); KDEN Broadcasting Co., 225 N.L.R.B. 25 (1976), which includes processing grievances and administering the collective bargaining agreement, NLRB v. Acme Indus. Co., 385 U.S. 432, 436, 87 S.Ct. 565, 568, 17 L.Ed.2d 495 (1967), functions performed by shop stewards and, in the instant case, by WTFs. Furthermore, the vital role that stewards play in the collective bargaining process by policing the contract, advising employees on contractual provisions and representing employees in on-site grievance proceedings long has been recognized. See, e.g., Aeronautical Indus. Dist. Lodge 727 v. Campbell, 337 U.S. 521, 528 n. 5, 69 S.Ct. 1287, 1290 n. 5, 93 L.Ed. 1513 (1949); D'Amico v. NLRB, 582 F.2d 820, 823-25 (3d Cir.1978). Therefore, unions have a presumptively legitimate and substantial interest in appointing shop stewards who most effectively will administer the contract in the union's interest. Teamsters, Local 959, 239 N.L.R.B. 1387, 1389 (1979).
 
 
 23
 By necessity, the individual charged with contract administration and the processing of grievances must work closely with union incumbents and with the employer. As we recognized in Newman v. Local 1101, Communications Workers, 570 F.2d 439 (2d Cir.1978), a shop steward is "under a duty as a representative of the union's management to cooperate with it and to implement its directives." Id. at 445. Inherent in that duty is some degree of allegiance and support for goals of the union management:
 
 
 24
 Unless the management of a union, like that of any other going enterprise, could command a reasonable degree of loyalty and support from its representatives, it could not effectively function very long. To obligate union leadership to tolerate open defiance of, or disagreement with, its plans by those responsible for carrying them out, would be to invite disaster for the union.
 
 
 25
 Id. Thus, "the union is legitimately entitled to hostility or displeasure toward dissidents in such positions where teamwork, loyalty, and cooperation are necessary to enable the union to administer the contract and carry out its side of the relationship with the employer." Shenango, Inc., 237 N.L.R.B. 1355 (1978). Effective contract administration could be hampered if union officials were not allowed to consider such attributes as teamwork, cooperation and loyalty in shop stewards or on-site representatives. We see no reason why the union here must await a WTF's actual dereliction of his duty of allegiance in his representational capacity, rather than consider, at the outset, what the risks of his disloyalty are. We therefore affirm the Board's determination that loyalty may be a legitimate consideration in referral to a WTF position. The substantial union-wide benefits from the appointment of effective collective bargaining representatives outweigh the incidental encouragement of pro-union sentiment toward incumbents that might result from the use of a loyalty standard. See Great Dane Trailers, 388 U.S. at 34, 87 S.Ct. at 1798.
 
 
 26
 Petitioners actively asserted that even if loyalty were an appropriate consideration, the actual hiring practices of the union for the WTF positions would indicate the arbitrary application of the loyalty standard. Prior to the hearing before the ALJ, the union moved to revoke the General Counsel's subpoena of union records containing information about individuals who actually had been hired for the WTF positions. The ALJ granted the union's motion to revoke the subpoena, thereby precluding the discovery and presentation of such evidence. Furthermore, the ALJ refused to hear the evidence that petitioners had been able to gather on the issue. The ALJ specifically stated that because the issue was limited to whether the union discriminated on the basis of loyalty, "I precluded them from introducing evidence to show that there are other people who are not so loyal who have received these positions and to show other people had less seniority and received the positions." Joint App. at 277.
 
 
 27
 While the loyalty standard is an appropriate criterion for WTF referral, it may not be applied in an arbitrary manner. See Teamsters Local 959 (Ocean Technology), 239 N.L.R.B. 1387, 1389 (1979). Evidence of how the union actually made referrals is relevant--indeed critical--to the issue of whether the loyalty standard was applied evenly or was merely a pretext for preferential treatment of individuals favored by incumbent officials. See, e.g., Carpenters Union Local No. 25, 769 F.2d at 580 (evidence of favoritism by union officials to long-term friends and political allies supports finding of discrimination). Therefore, the Board's determination that "[t]here is, moreover, no probative evidence that the respondent applied this loyalty standard in an arbitrary or invidious fashion" is insupportable inasmuch as evidence was not allowed to be presented on the issue. Moreover, there were indications in the record that loyalty was not uniformly considered in all cases: Sasso conceded that relatives of union officials, who were not even union members, had been appointed as WTFs. Joint App. at 7 n. 4, 163-68. It also appears that a former business agent of Local 814, who had been incarcerated for labor racketeering, was appointed to a WTF position shortly after his release from federal prison. Id. at 249. Because petitioner was prevented from discovering and presenting evidence on the loyalty standard as it actually was applied by the union, we vacate so much of the Board's order as rejects the claim that the union applied the standard arbitrarily and we remand the cause for discovery and a determination of that issue.
 
 CONCLUSION
 
 28
 In summation, we conclude that the Board's determination, allowing consideration of loyalty as a selection criterion for WTF positions that entail responsibility for on-site contract administration, is consistent with the Act, but that the Board's determination that the loyalty standard was not applied arbitrarily has no basis in the record as developed by the ALJ. Therefore, we grant the petition for review, vacate the Board's order as to petitioner's claim that the loyalty standard was applied arbitrarily, and remand.
 
 
 
 [1]
 Petitioner also relies on cases in which the appointment of a shop steward to a job deprived a worker already on the job of employment. This case does not present such a situation. While such a replacement may be upheld where legitimate representational concerns are at issue, NLRB v. Great Dane Trailers, Inc., 388 U.S. at 33-34, 87 S.Ct. at 1797-98; Ashley, Hickham-Uhr Co., 210 N.L.R.B. 32, 33 (1974); Local 2375, Pile Drivers, 267 N.L.R.B. 320 (1983), the necessity for such replacement must be shown. However, as the court noted in Paintsmiths, "[p]lacing a steward on the job at the beginning of the project merely prevents the employee's hire in the first place, whereas placing a steward at a later time, causing thereby another employee's removal from the job, is a more visible display of union power, and is therefore a stronger reason to infer an impermissible encouragement of union activism." 620 F.2d at 1334. Here, the collective bargaining agreements specifically created a position to be filled by the union with an individual explicitly invested with the authority and the duty to administer that agreement on behalf of the union. This contract provision fills a substantial need in ensuring the continuous presence of a union-designated representative on the job site to perform essential collective bargaining functions. All employees at the job site benefit by the promotion of effective contract administration. See, e.g., NLRB v. Local 443, Int'l Bhd. of Teamsters, 600 F.2d 411, 413 (2d Cir.1979)