Jack B. YAGER, et al., Plaintiffs,

v.

Ronald CAREY, et al., Defendants.

Civ. A. Nos. 93–1054, 93–1970 (RCL).

United States District Court,
District of Columbia.

Nov. 27, 1995.

708

William Joseph Rodgers, Collier, Shannon, Rill, & Scott, Washington, DC, for Plaintiffs.

Earl Vincent Brown, Jr., International Brotherhood of Teamsters, Washington, DC, for Defendants.

## MEMORANDUM OPINION

LAMBERTH, District Judge.

This case comes before the court on the parties' cross-motions for summary judgment, and plaintiffs' motion to amend its complaint. Plaintiffs are former officials of the Central Conference of Teamsters ("CCT"). Defendants are the highest ranking officials in the International Brotherhood of Teamsters ("IBT").[1] At issue is the legali-

---

1. Specifically, defendants include: the International Brotherhood of Teamsters ("IBT"); Ronald Carey, General President of the IBT; Thomas Sever, General Secretary–Treasurer of the IBT; and Sam Theodus and the rest of the members of the General Executive Board, the IBT's executive

ty of the removal of plaintiffs from their union offices by defendants. Previously, in an opinion dated June 29, 1993, this court denied plaintiffs' motion for a preliminary injunction. In the related case, Civil Action Number 93–1970, this court denied plaintiffs' motion for a preliminary injunction in an opinion dated November 16, 1993.

Following discovery, defendants have now moved for summary judgment on all counts of both complaints, and plaintiffs have moved for summary judgment on Count I of their second complaint (Civ. No. 93–1970). In this consolidated opinion, upon consideration of the parties' submissions and the relevant law, for the reasons set forth below, the court shall grant defendants' motion for summary judgment on all counts of Civil Action Number 93–1970, and on counts one through five and seven of the amended complaint in Civil Action Number 93–1054. The court shall also dismiss count six of plaintiffs' amended complaint for failing to state a proper claim. Accordingly, the court shall deny plaintiffs' motion for summary judgment on count one of their complaint in Civil Action Number 93–1970. Finally, the court shall deny plaintiffs' motion to amend their complaint in Civil Action Number 93–1970.

## I.

## BACKGROUND

### A. *Internal Structure of the Teamsters*

The International Brotherhood of Teamsters is a labor organization made up of the International Union and its affiliates, that is, the local unions, multi-state conferences, trade divisions, and members. The International Union is the parent organization that functions as an umbrella for coordinated action by the local affiliates. The officers of the International Union are the General President, the Secretary–Treasurer, and seventeen Vice–Presidents who make up the GEB, the decision-making arm of the International. Defendant Carey won the election

for General President in 1991 on a "reform" platform.

Each of the local unions and state conferences is a separate labor organization with its own constitution, bylaws, officers, and dues structure. These local unions and state conferences band together by region to form five major Area Conferences: Eastern, Central, Western, Southern, and Canadian Conferences. The Central Conference of Teamsters ("CCT") is the largest and most influential, as it represents more than one-third of the entire membership.

The Area Conferences are also separate labor organizations. They are governed by committees whose members are elected at an Area Conference convention by vote of the local unions within the covered geographical area. The Central Conference of Teamsters' Policy Committee governs the Central Conference. Plaintiff Jack Yager is the former chairperson of the CCT and the former chairperson of the Policy Committee of the CCT. Yager ardently supported Carey's opponent in the 1991 elections.

The International also maintains twelve trade divisions that serve local unions and are organized along industry lines such as the freight, auto transport, and beverage and soft drink industries. The trade divisions are not separate labor organizations, but they are staff bodies organized jointly by the International and the area conferences to advise and assist local unions in multi-area or multi-employer "Master Agreements," collective bargaining, and contract administration. The Automobile Transport Division, also known as the "Car Haul" division, is the trade division relevant to this case. Plaintiff Brendan Kaiser is the former Chairperson and Director of the CCT Car Haul Division.

### B. *The NMATA and the Joint Committee*

Many local unions within the Central Conference are signatories to a Car Haul Master Agreement known as the National Master Automobile Transporters Agreement ("NMATA") and its Central–Southern Area

---

governing committee. Plaintiffs also name the following additional defendants in Civil Action Number 93–1970: Thomas Gilmartin, prosecutor in plaintiffs' disciplinary hearing; Joseph Mo-

linero, President of Local 211; Carolyn Robinson, Secretary–Treasurer of Local 315; and Leo Deaner, business agent for Local 776.

Conference Supplement.[2] Pursuant to the NMATA, the Central and Southern Conferences, along with the relevant employers, formed the Central–Southern Areas Automobile Transporters Joint Arbitration Committee ("Joint Committee") to adjust grievances for all local members situated within the thirteen states of the Central Conference and the nine states of the Southern Conference.

The Joint Committee is a grievance panel that is staffed by an equal number of representatives from the Conferences' local unions and from the employers who are parties to collective bargaining agreements with those local unions. This panel hears regionally significant grievances in the car haul industry not settled at the local level. The Joint Committee is co-chaired by a representative from the employers (the "Employer Chair") and a representative from the union (the "Union Chair").

## C. The Dispute

In the fall of 1992, plaintiff Jack Yager, then chairperson of the Policy Committee for the CCT named plaintiff Brendan Kaiser as the new chairperson and director of the Central Conference Car Haul Division.

The dispute between the plaintiffs and defendant Ron Carey began in November of 1992, when Kaiser, with Yager's approval, purported to remove Charles Lee from his position as Union Chair of the Joint Committee. Lee had served in this capacity since 1989; however, Kaiser had expressed his dissatisfaction with Lee's performance as Union Chair.[3] Kaiser then, again with Yager's approval, appointed himself to the position of Union Chair. Carey informed Kaiser in a letter dated November 25, 1992, that he, Kaiser, lacked the authority to remove or appoint the Union Chair. Both Yager and Kaiser disputed Carey's interpretation of union rules, and they refused to recognize Lee as the Union Chair.

To comply with what plaintiffs believed to be the Joint Committee's requirement that

its union members elect the Union Chair, Kaiser called a meeting of local representatives of the CCT and the SCT for January 25, 1993, in Dania, Florida. The notice sent by Kaiser regarding the meeting made no reference to his plan to hold an election. At the meeting, the representatives elected Kaiser to be the Union Chair over Lee. That same day, Carey again notified Kaiser that Kaiser had no authority to serve as Union Chair, and Carey advised the Employer Chair, James Osmer, that Lee was the duly authorized Union Chair.

At the January 26, 1993, meeting of the Joint Committee, Kaiser and Lee both demanded recognition as Union Chair. Osmer refused to recognize either and, except for a small number of cases processed with a temporary Union Chair, refused to hear the scheduled grievances.

### 1. The Michigan Suit

On February 2, 1993, plaintiffs, through the CCT and the SCT, brought suit in United States District Court for the Eastern District of Michigan against the Car Haul Employer Association. The plaintiffs seek a declaratory judgment recognizing Kaiser as the proper Union Chair of the Joint Committee. The employers brought a third-party action against the IBT, Carey, and the other International officers. The IBT asserts that the appointment of the Union Chair is an internal union matter, and that the IBT Constitution authorizes the IBT General President, Ron Carey, to make such appointments. This matter is still pending.

### 2. The General Executive Board Resolution

On March 7, 1993, Carey convened the International's General Executive Board ("GEB") to address the issue of who has the authority to appoint the Union Chair of the Joint Committee. The GEB passed a resolution that added the following provision to Article XII of the IBT Constitution in order

---

**2.** An area conference or even a local union may add supplements to a master agreement to tailor that agreement to its particular needs.

**3.** Plaintiffs claim that Kaiser "personally observed" that Lee violated the Joint Committee's Rules of Procedure by refusing to recuse himself from certain panels and hearings in cases that the local to which Lee belonged had an interest.

"to reaffirm the right of the General President" under Article XII to appoint union chairs of joint arbitration committees:

> In circumstances where the General President deems it necessary, the General President shall have the authority to appoint the Union Chairperson of any joint arbitration and grievance panel provided for by master agreements.

The GEB took this action pursuant to Article XII, Section 6, of the IBT Constitution, which provides:

> The General Executive Board is empowered to amend, delete or add to this Article at any time it believes such action will be in the interests of the International Union or its subordinate bodies.

On March 22, 1993, Carey sent Yager a letter demanding that he withdraw his claim of authority over the appointment of the Union Chair, advise the Employer Chair that Lee is the rightful Union Chair, recognize Lee as such, and take no other actions inconsistent with Carey's authority over the appointment of the Union Chair. Carey made a similar demand on Kaiser that same day. At the end of both letters, Carey threatened disciplinary action if either plaintiff failed to comply.[4]

#### 3. *The Internal Charges*

Despite the warnings, both plaintiffs continued to treat Kaiser as the rightful Union Chair. On April 23, 1993, Carey filed internal union charges against Yager and Kaiser for engaging in conduct that violated the IBT Constitution. Carey lodged seven charges against Yager and one against Kaiser.

Carey alleged violations by Yager of the recent amendment to the Constitution of the IBT as well as other, unrelated violations. The first two charges against Yager concerned his conduct prior to the March 7, 1993, amendment. These charges stemmed from Yager's replacement of Lee with Kaiser as Union Chair. The third charge against Yager, identical to the one against Kaiser, alleged that Yager and Kaiser failed to com-

ply with Carey's post-March 7 directives. The remaining charges against Yager stemmed from actions unrelated to the controversy over the appointment of Kaiser as Union Chair. These charges included (1) failing to effectively enforce a successorship clause in a master agreement; (2) acquiescing in the relocation of an employer's operation; (3) entering into a collusive agreement with an employer that contained substandard wages and benefits; and (4) increasing the per capita tax paid to the CCT by affiliated local unions without securing prior approval of the General President.

#### 4. *The Panel and the Hearing*

On May 21, 1993, Thomas Sever, the IBT General Secretary–Treasurer and a defendant in this action, appointed a three-person Panel to hear the charges that Carey had filed. On May 27, 1993, Yager and Kaiser filed their first complaint in this court (Civ. No. 93–1054), seeking, among other relief, a preliminary injunction against the holding of a disciplinary hearing on the charges filed against them. This court denied plaintiffs' motion in an opinion dated June 29, 1993, *Yager v. Carey*, No. 93–1054, Mem.Op., 1993 WL 328128 (D.D.C. June 29, 1993) (Lamberth, J.) [hereinafter *Yager I* ].

On July 26, 1993, the Panel appointed by Sever commenced a three-day hearing on the charges. At this hearing, the Panel permitted plaintiffs to be represented by counsel, and the Panel permitted plaintiffs to call and cross-examine witnesses. After the hearing, the panelists prepared written recommendations to the GEB. The Panel concluded that the GEB had acted properly in amending the IBT Constitution, and that Yager and Kaiser, by not complying with Carey's directives given pursuant to the March 7, 1993, amendment, violated the Constitution. The Panel further found that Yager had violated the Constitution by failing to notify the appropriate IBT officers of an employer's express intent to avoid a successorship provision, and by signing a substandard agreement. The Panel recommended dismissal of the first two charges regarding conduct prior to the

---

**4.** Article XIX of the IBT Constitution permits any member to file charges against any other member or officer for violating the Constitution.

March 7 amendment. The Panel also recommended dismissal of the remaining charges against Yager finding that there were no Constitutional violations. Finally, the Panel recommended that Yager and Kaiser be stripped of their union membership if they failed to comply with Carey's directives within five days.

The GEB met on September 21, 1993, to review the Panel's recommendations. After completing its deliberations, the GEB issued a written decision in which it accepted the factual findings of the hearing panel, and it affirmed the Panel's recommended findings that Yager and Kaiser had violated the IBT Constitution by failing to comply with Carey's post-March 7 directives. The GEB rejected the Panel's dismissal of the charges relating to Yager's conduct prior to March 7. It affirmed the Panel's other recommended findings. The GEB decided to remove Yager and Kaiser from their union offices and to permanently bar them from holding any union office.

Yager and Kaiser then filed their second complaint with this court (Civ. No. 93–1970), requesting a temporary restraining order to prevent their removal from office. This court denied the motion on September 23, 1993. Yager and Kaiser then moved for a preliminary injunction to prevent defendants from acting on their decision to remove plaintiffs from their offices and bar them from holding office in the future. This court denied that motion in a November 16, 1993, opinion, *Yager v. Carey*, No. 93–1970, Mem. Op., 1993 WL 816364 (D.D.C. Nov. 16, 1993) (Lamberth, J.) [hereinafter *Yager II* ].

The Independent Review Board ("IRB"), established pursuant to the Consent Order,[5] reviewed and affirmed the decision of the GEB in an opinion dated January 27, 1994.

## II.

## LEGAL STANDARD

Summary judgment is appropriate where there is no genuine dispute as to any materi-

al fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Inferences drawn from the facts must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). If summary judgment is to be denied, there must be evidence on which the jury could reasonably find for the non-moving party. *Anderson v. Liberty Lobby*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment may be granted. *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552. Additionally, the Supreme Court has stated that conclusory and unsupported allegations, hearsay, or opinions cannot be used to create genuine issues of fact. *See Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553.

## III.

## ANALYSIS

### A. *Full and Fair Trial*

Count One of plaintiffs' second complaint (No. 93–1970) alleges that defendants violated plaintiffs' right to a full and fair trial guaranteed under section 101(a)(5)(C) of the Labor Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C.A. § 411(a)(5)(C) (1985). The plaintiffs contend that their disciplinary hearing and the post-trial review by the GEB violated a myriad of IBT constitutional provisions and due process requirements protected by the LMRDA, entitling plaintiffs to full reinstatement of their prior offices as well as damages. Both sides argue that the facts surrounding plain-

---

**5.** The members of the IRB include former United States District Court Judge Frederick B. Lacey, former Director of the Federal Bureau of Investigation, William H. Webster, and Grant Crandall, an attorney with the law firm of Crandall, Pyles and Haviland. The IBT established the IRB pursuant to the Consent Order in the government's 1988 RICO action against the IBT. The government ordered the creation of the IRB in order to protect the members and ensure their autonomy through the democratic process. The IRB has the authority to review decisions of the GEB.

tiffs' internal trial and review are undisputed. There being no dispute as to material facts, for the reasons discussed below, the court finds that plaintiffs have failed to show that defendants denied their right to a full and fair disciplinary hearing and review. Accordingly, the court shall grant defendants' motion for summary judgment on plaintiffs' full and fair hearing claim.

### 1. *The International Constitution Claims*

Plaintiffs allege that defendants violated the LMRDA's guarantee of a full and fair trial by failing to comply with provisions the IBT Constitution. In their motion for summary judgment, plaintiffs focus their attack on the constitutional requirement that the charging party (Carey) must "appear in person and/or present evidence before the [internal union] trial ... body," or the union must dismiss the charges.[6] IBT Constitution, art. XIX, § 2(d). The parties do not dispute that Carey, the charging member, was not present at the disciplinary hearing. In response to plaintiffs' request for dismissal, both the Panel and the GEB found that Section 2(d) was ambiguous, and they then construed that section to require *either* that the charging party be present *or* that the charging party ensure that evidence is presented against the accused. The defendants then found that because Carey appointed a prosecutor who presented the evidence, Section 2(d) had been satisfied. Plaintiffs, on the other hand, argue that Section 2(d) requires the charging party to be physically present *and* to present evidence. Because Carey did not attend the hearing, plaintiffs contend, the Panel should have dismissed the charges. Finally, plaintiffs argue, as they must under the LMRDA, that the failure to dismiss the charges violated the Constitution, and this violation prejudiced plaintiffs, deny-

ing them the opportunity for a full and fair hearing.

A court considering a claim for relief under the LMRDA because a party alleges that an internal union disciplinary hearing violated the union's constitution must conduct a two-step inquiry: (1) the court must find that the hearing violated the constitution; and (2) it must find that the violation deprived plaintiffs of a fair trial within the meaning of the LMRDA. As this court found in its prior opinion, the rights protected by Section 101(a)(5)(C) of the LMRDA are procedural rights associated with hearing. The deprivation of a full and fair hearing means "severely impairing [plaintiffs'] ability to prepare and present a defense or ... seriously increasing the risk that the decision-maker will reach an erroneous determination." *Yager II*, at 8 (*citing Curtis v. International Alliance of Theatrical Stage Employees*, 687 F.2d 1024, 1030 (7th Cir. 1982); *Ricks v. Simons*, 759 F.Supp. 918, 920–21 (D.D.C.1991)).

In its prior opinion, this court interpreted Section 2(d) of the IBT Constitution to require Carey to be physically present at the hearing. *See Yager II*, at 7.[7] The court has no cause now to reconsider that conclusion because even though defendants may have violated the IBT Constitution, plaintiffs are not entitled to relief under the LMRDA because they cannot show that this violation impaired their right to a full and fair hearing. The full and fair trial provision of the LMRDA protects only the procedural rights of an accused party in an internal union proceeding. As the Seventh Circuit stated, the constitutional violation must severely impact a party's ability to prepare or present a defense. *See Curtis*, 687 F.2d at 1030.

---

6. Plaintiffs argue that the disciplinary hearing and review violated not only Article XIX, Section 2(d) of the IBT Constitution, but also Sections 1(a) and 7(a) of Article XIX. Section 1(a) prohibits an involved officer or member from serving on the disciplinary proceedings, and Section 7(a) contains the Constitution's double jeopardy provision. Because plaintiffs raise these provisions in other contexts in their briefs, the court will analyze them as plaintiffs have presented them.

7. "Loathe as this court is to question a union's interpretation of its own internal rules, this court must conclude that Carey's failure to appear at trial for cross-examination appears to be a violation of the union constitution." *Yager II*, at 7.

Plaintiffs devote much of their discussion of this issue in their summary judgment papers to arguing why it was that the defendants misconstrued the Constitution. Regardless of the reasons for the error, the court agrees that defendants' interpretation was wrong.

Plaintiffs assert two separate ways in which their right to a full and fair trial was impinged by Carey's absence: (1) the prosecution's failure to call Carey as a witness impaired their ability to prepare and present their defense; and (2) that defendants forced plaintiffs to litigate a case that should have been dismissed. With respect to their first claim, plaintiffs themselves never attempted to call Carey as a witness. Although plaintiffs' counsel made several requests during the hearing that the prosecutor call Carey to cure potential hearsay or authentication problems with documents, defendants' counsel never attempted to call Carey to testify. Plaintiffs cannot claim a denial of their right to question Carey about the charges when they did not try to call him to testify. Moreover, plaintiffs have not shown that Carey possessed information or first-hand knowledge essential to their defense. In order to sustain a claim that defendants denied them a full and fair trial, plaintiffs must show that Carey was an essential witness to their defense. Witnesses without knowledge of the relevant facts are not essential. Without a showing that Carey's absence "severely" impaired plaintiffs' ability to prepare and present their case, they have no cause of action under the LMRDA.

The plaintiffs' second claim of prejudice is simply that absent the violation of the Constitution, the case could not have gone forward, and plaintiffs would not have been disciplined. To this end, plaintiffs distinguish cases where they believe courts have ignored "minor procedural time and truly 'technical' [constitutional violations] with no mandated substantive result...." Pls.' Mot. for Summ.J. at 34. In contrast, plaintiffs argue, the requirement that the case be dismissed with prejudice cannot be ignored or cast as minor. However, plaintiffs' argument reveals that they misconstrue the type of rights protected by the full and fair trial guarantees of the LMRDA. When an internal union rule has been violated, section 101(a)(5)(C) gives union members a cause of action only when that violation severely impairs the member's ability to prepare and present a defense, or by increasing the risk that a decision maker will reach an erroneous determination. *See Curtis,* 687 F.2d at 1030.

This provision is aimed at procedural rights in the hearing, not, as plaintiffs would argue, a "substantive entitlement." In *Ricks,* for example, the court found that because the constitutional violation did not deprive plaintiffs of their procedural rights to present evidence, the violations did not support a claim under the LMRDA. 759 F.2d at 923. The constitutional violation in *Ricks* was a time-bar claim; plaintiffs believed that the charges were time barred. As with this case, if the union had conformed to plaintiffs' reading of their constitution, the charges would have been dismissed. *Id.*

Thus, the inquiry for a court under this provision is whether the violation impaired rights associated with procedural due process. Section 101(a)(5)(C) ensures that unions will give accused members a fair opportunity to present their case; it does not provide a means for union members to sue for compliance with that member's interpretation of all internal union rules. Unless the violation impairs a member's ability to establish the facts and circumstances surrounding the charges, the LMRDA provides no relief.

### 2. *Due Process under the LMRDA*

The full and fair trial provision of the LMRDA protects not only procedural rights stemming from internal union rules, but also all procedural rights afforded to accused members under " 'fundamental and traditional concepts of due process.' " *Ritz v. O'Donnell,* 566 F.2d 731, 735 (D.C.Cir.1977) (*quoting Tincher v. Piasecki,* 520 F.2d 851, 854 (7th Cir.1975)). Plaintiffs claim that the disciplinary hearing and subsequent review by the GEB denied them several of these fundamental rights.

As this court described in its previous opinion, "[a]lthough union members are clearly entitled to the fundamental elements of due process in their disciplinary hearings, the procedures of a union hearing need not be as rigorous as a federal court's [procedures]." *Yager II,* at 12. A charged member, for example, has no right to be represented by counsel, nor does the member have a right to the "technical rules of pleading, procedure and evidence." *Frye v. United*

*Steelworkers of Am.,* 767 F.2d 1216, 1224 (7th Cir.1985), *cert. denied,* 474 U.S. 1007, 106 S.Ct. 530, 88 L.Ed.2d 461 (1985). Therefore, the fundamental due process rights guaranteed under the LMRDA include: (1) the existence of "some evidence" to support the charges made, *International Bhd. of Boilermakers v. Hardeman,* 401 U.S. 233, 246, 91 S.Ct. 609, 617, 28 L.Ed.2d 10 (1971); (2) an impartial tribunal, *Tincher,* 520 F.2d at 854; (3) an opportunity to confront "pertinent witnesses," *Ritz,* 566 F.2d at 735–36; and (4) an opportunity to present evidence, *Tincher,* 520 F.2d at 854.

Plaintiffs allege due process violations in all aspects of the disciplinary hearing and review. Accordingly, the court will examine both the hearing and the review by the GEB, ultimately concluding that plaintiffs' allegations must fail.

### a. *The Disciplinary Hearing*

Plaintiffs attack three aspects of their disciplinary hearing as violative of their right to a full and fair trial: (1) two of the three Panel members, defendants Molinero and Robinson, were biased and loyal to defendant Carey; (2) the procedures employed during the hearing violated fundamental notions of procedural due process; and (3) the Panel members were unduly influenced by Joseph Pass, counsel for the Panel. After considering plaintiffs' claims, the court shall reject them and find that plaintiffs have failed to establish that the disciplinary hearing violated their LMRDA due process rights.

### (1) *Bias of Panel Members*

■ In order to sustain a claim that the Panel members (or as discussed later, the GEB members) were biased in violation of plaintiffs' due process rights, plaintiffs must make specific factual allegations of bias that show that the panelists were incapable of hearing plaintiffs' case impartially. *See Frye,* 767 F.2d at 1225; *Yager II,* at 17–18. "Courts ... are justified in ruling a union tribunal biased only upon a demonstration that it has been substantially actuated by improper motives...." *Parks v. International Bhd. of Elec. Workers,* 314 F.2d 886, 913 (4th Cir.1963), *cert. denied,* 372 U.S. 976, 83 S.Ct. 1111, 10 L.Ed.2d 142 (1963). Courts have found an impermissible bias in internal

union hearings and reviews when a member of the tribunal prejudged the guilt of the accused member. *See Goodman v. Laborers' Int'l Union of N. Am.,* 742 F.2d 780 (3d Cir.1984); *Falcone v. Dantinne,* 420 F.2d 1157 (3d Cir.1969). In another case, a member established improper bias when the charging party's brother and father served on the tribunal. *Bollitier v. International Bhd. of Teamsters,* 735 F.Supp. 612 (D.N.J. 1989). Another court held that supporters of the winner of a union election could not try the supporters of the loser in that election regarding charges stemming from the very same election. *Semancik v. United Mine Workers of Am.,* 466 F.2d 144, 157 (3d Cir. 1972). Finally, a member can establish unfair bias in violation of the member's right to a full and fair trial when at least one member of the tribunal is biased. *Id.*

■ Plaintiffs argue that defendant Joseph Molinero, chairperson of the Panel, is a "well-documented" Carey loyalist. Plaintiffs point out that in 1992 when Molinero's local union was involved in a strike with a company employing 90% of the local's members, Carey, in his capacity as General President, approved the release of $3.5 million in strike benefits to the local members. Plaintiffs also state that defendants Sever and Morris of the GEB, supported Molinero at "several" rallies in Molinero's home state.

That strike benefits were approved for Molinero's local and other defendants attended "several" rallies for Molinero falls far short of "demonstrating a corrupting bias that would arise to fatal procedural flaws." *Yager II,* at 17. Plaintiffs have not alleged that Molinero's local's receipt of strike benefits was unwarranted or in any way uncommon. The mere fact that Carey, as General President, approved the benefits cannot support an inference that Molinero held a bias against plaintiffs.

■ Likewise, plaintiffs' allegations of bias against panelist Carolyn Robinson fail. This bias allegedly arises from the fact that Carey appointed Robinson to the Teamsters United Parcel Service National Negotiating Committee and the Teamsters Human Rights Commission. As with Molinero,

plaintiffs have failed to show that the appointments supply a sufficient basis to infer that Robinson held a bias in favor of Carey to such an extent that her decisions on the merits of the charges against plaintiffs was driven by improper motives. Robinson stated during deposition testimony that prior to the hearing, she had no knowledge of the dispute between Carey and the plaintiffs, had never met vice-president Sever, knew only that Yager was head of the Central Conference, and had never heard of Kaiser. On these facts the court cannot say that plaintiffs have demonstrated a bias that denied them procedural due process under the LMRDA.

### (2) *Procedures During the Hearing*

Plaintiffs next allege five separate violations of their rights during the conduct of the disciplinary hearing. The court finds no merit to any of the five claims.

#### (a) *No Rules of Procedure*

■ Plaintiffs believe that defendants deprived them of their rights to a full and fair hearing by failing to establish rules of procedure in advance of the hearing. Apparently conceding that no written rules governed the hearing, defendants argue that the Panel announced on the day of the hearing that it would follow the rules of procedure for labor arbitration hearings, and it stated that the Panel would "listen to the testimony from both sides." The court now finds that defendants' failure to establish rules of procedure in advance of the hearing did not violate plaintiffs' due process rights.

A union hearing does not require the "full panoply of rights" received by litigants in federal court. *Yager II*, at 13 (*citing Frye*, 767 F.2d at 1224). Moreover, the inquiry by this court is whether the failure to establish rules of procedure in advance denied plaintiffs the opportunity to present all of their witnesses or to effectively cross-examine defendants' witnesses. Plaintiffs do not claim, and this court finds that they could not claim, that a lack of rules of procedure inhibited their ability to present their case. Accord-

ingly, plaintiffs cannot claim that their right to a full and fair trial has been violated.

#### (b) *Double Jeopardy under the IBT Constitution*

■ By permitting Carey to file charges against plaintiff Kaiser when charges against him were already outstanding, plaintiffs allege that the Panel violated the double jeopardy bar of Article XIX, Section 7(a) of the IBT Constitution.[8] Prior to Carey's charge against Kaiser, Charles Lee and Robert Cummins brought charges against Kaiser for removing Lee as Union Chair and appointing himself to that position. The charges stemmed from Kaiser's conduct before the GEB's March 7, 1993, constitutional amendment. Lee and Cummins dropped the charges after the hearing had started, but before that panel had made a decision. In response to Kaiser's double jeopardy claim, the Panel convened to hear Carey's charges decided that because the earlier charges challenged Kaiser's conduct before the constitutional amendment they were not substantially the same as Carey's charges because they arose under different circumstances. The Panel concluded that there was no double jeopardy violation because of the different circumstances and because the charges were dropped before the completion of the trial. "The union's determinations about the scope of the double jeopardy bar— whether the factual cores of the two charges are sufficiently different, and whether dropping charges in a prior trial avoids double jeopardy—deserve great deference by this federal court." *Yager II*, at 10 (*citing Monzillo v. Biller*, 735 F.2d 1456, 1458 (D.C.Cir. 1984)). Because plaintiffs do not dispute the facts as recited above, this court will defer to the union's legal construction of its constitutional double jeopardy clause because the court finds that the interpretation is not "unreasonable or made in bad faith." *Id.* (*quoting Monzillo*, 735 F.2d at 1458).

#### (c) *Hearsay and the Authentication of Documents*

■ Plaintiffs complain that they were not permitted to examine the authors of

---

8. Nor shall a member or officer shall be required to stand trial on charges that are substantially the same or arise under the same circumstances as prior internal-union charges against such member or officer....
IBT Constitution, art. XIX, § 7(a).

some of the documents that prosecutor Gilmartin submitted as testimony in the hearing. In other words, plaintiffs claim that the Panel's acceptance of defendants' unauthenticated and thus hearsay documents unfairly prejudiced their right to a fair hearing. Unlike a federal court, defendants can submit reliable hearsay in an internal union hearing. *United States v. International Bhd. of Teamsters*, 998 F.2d 120, 124 (2d Cir.1983).

■ During the hearing, the Panel invited the plaintiffs to challenge the letters as forgeries when Gilmartin introduced them. Hr'g Tr. at 139. The Panel also promised plaintiffs the opportunity to challenge the letters during cross-examination. Trial Transcript, at 126. Moreover, plaintiffs have not alleged any specific impermissible inferences that the Panel may have drawn from the unauthenticated documents, nor have plaintiffs ever alleged that the documents were forgeries. Under the LMRDA, plaintiffs must point out specific prejudice that resulted from the admission of the documents, that is, prejudice that impaired their ability to present their case. Because the court can find no such prejudice, the court now finds that this procedural irregularity did not deny them a full and fair trial. *Yager II*, at 14.

### (d) *No Opportunity to Cross–Examine Defendant Carey*

Plaintiffs advance another reason why Carey's absence from the hearing violated their right to a full and fair trial: plaintiffs had no opportunity to cross-examine their accuser, Carey, in violation of their fundamental right to confront and cross-examine witnesses. *See Ritz*, 566 F.2d at 735. Plaintiffs further allege that the Panel denied plaintiffs this opportunity despite "numerous requests [by plaintiffs' counsel] that defendant Carey attend and participate in the trial." Pls.Mot. for Summ.J. at 43–44.

■ In this circuit, while plaintiffs have a right implicit in the full and fair hearing provision of the LMRDA to examine or cross-examine *pertinent* witnesses, the plaintiffs do not necessarily have a right to question the person who filed the charges. *See Ritz*, 566 F.2d at 736. "If the charging

party, or his counsel, presents witnesses or other evidence at the proceeding, and the respondent is offered both full opportunity to test the validity of that evidence and the opportunity to call the charging persons as witnesses (even as hostile witnesses) in the event he thinks there [sic] testimony will help his case, a full and fair hearing is assured." *Id.*

■ As discussed above, Carey did not directly participate in the events giving rise to the charges, and the issues of the hearing did not depend upon testimony he might have provided. Therefore, the court finds that Carey is not a "pertinent witness." The court has also found that plaintiffs never attempted to call Carey as a witness during the hearing. Furthermore, plaintiffs have made no allegations that the Panel actively discouraged or prevented plaintiffs from calling Carey. Plaintiffs' failure to attempt to call Carey as a witness results in the effective waiver of their right to do so. *See Yager II*, at 15–16 (*citing Ritz*, 566 F.2d at 735).

### (e) *The Prosecutor's Conduct*

Finally, plaintiffs allege that the union's prosecutor at the hearing, Tom Gilmartin's suggestion of answers to witnesses and his attempts to enter his own testimony into the record denied plaintiffs a full and fair hearing. This claim is utterly without merit. "The panel recognized that Gilmartin—who is a truck driver, not a lawyer—was presenting his own impressions as evidence, and they ignored his impermissible testimony accordingly." *Yager II*, at 16. Furthermore, Panelist Deaner answered plaintiffs' counsel's objection to Gilmartin's "testimony" by saying, "this Panel, quite frankly, is very keenly aware [that] what he says is not evidence. I mean, give them [that is, his fellow panelists] some credit. They're not stupid." Hr'g Tr. at 437.

In light of the forgoing discussion, the court finds that none of plaintiffs' allegations of procedural errors denied plaintiffs their right to a full and fair trial.

### (3) *The Influence of Joseph Pass*

■ The final claim by the plaintiffs that defendants impaired their right to a full and

fair trial during the disciplinary hearing is that Joseph Pass, counsel to the Panel, unduly influenced the Panel by regularly interrupting the testimony, asking witnesses substantive questions, and participating in the substantive deliberations. Pass had a prior relationship with Carey through defendant Sever, and he was a friend and lawyer of Panelist Molinero. Defendants contend that Pass' participation was neither improper nor disruptive of plaintiffs' rights. The court agrees.

Plaintiffs believe that Pass exercised undue influence because of his participation in the hearing. First, plaintiffs allege that the Panel did not request, nor did they know before the hearing began, that Pass represented the Panel in the hearings. In addition to interrupting and questioning the witnesses, plaintiffs allege that Pass influenced the Panel's substantive deliberations. Panelist Deaner claims that once the Panel had decided to dismiss the first two charges against Yager, Pass asked them to reconsider that decision. Finally, Pass wrote the opinion of the Panel, and he later presented it to the GEB without the panelists' knowledge.[9] Although Pass' behavior may arouse suspicion, the court concludes that the Panel reached its decision independently of Pass. *See Yager II,* at 23.

First, although Pass urged the Panel to reconsider its dismissal of the first two charges against Yager, they declined to do so. Pass may have attempted to exert influence, but he did not succeed in this instance. In general, plaintiffs cannot point to any statements made during the hearing or the deliberations that demonstrate the effect of his bias on the Panel. Furthermore, although Pass drafted the Panel's opinion, each member read the draft and had him make appropriate changes. As for Pass' presentation of the Panel's opinion to the GEB, because the court concludes below that Pass' actions before the GEB had no material prejudicial effect on the GEB's decision, his presentation of the opinion to the Panel was not improper. Thus, the court finds that Pass did not have an improper influence on the

Panel in contravention of plaintiffs' right to a full and fair trial.

### b. *The Review by the GEB*

Plaintiffs contend that several aspects of the review conducted by the GEB denied plaintiffs their right to a full and fair trial under the LMRDA. The court now examines each of plaintiffs' allegations and concludes that none have merit.

#### (1) *Influence of Union Counsel Susan Davis*

■ Susan Davis, counsel to defendant Carey and counsel to the GEB during its deliberation of the plaintiffs' case, is alleged to have unduly influenced the GEB, denying plaintiffs their right to a full and fair trial. Plaintiffs' argument centers around Davis' participation in the GEB's deliberations as well as her relationship to Carey. After examining Davis' conduct as well as her alleged ties to Carey, the court concludes that plaintiffs have not proven a violation of Section 101(a)(5)(C).

Plaintiffs first allege that Davis unduly influenced the GEB through her specific interactions with the GEB. Plaintiffs claim Davis unduly influenced defendant Sever when she met with him and told him how to conduct the GEB's deliberation of plaintiffs' case. Plaintiffs further allege that Davis provided Sever with a "script" for the proceedings in the GEB. Finally, plaintiffs contend that Davis intentionally misled the GEB during their deliberations as to the meaning of the Article XIX, Section 2(d), the constitutional provision requiring the charging party to be present "and/or" present evidence.[10]

Davis' actions prior to or during the GEB's review of plaintiffs' case did not improperly prejudice plaintiffs' case. With respect to plaintiffs' claim that Davis improperly scripted the GEB proceedings, defendants argue that the advice given by Davis to Sever was procedural only. The defendants provided a copy of the "script" to the court, explaining that it merely discussed the flow that the GEB's deliberations should follow. The court agrees. "Davis simply performed her

---

**9.** Pass' activities with respect to the GEB and its deliberations are addressed below.

**10.** This constitutional provision is discussed above in section III(A)(1).

ordinary duties as Associate General Counsel for the International in assisting the GEB in its deliberations, as she regularly does." *Yager II*, at 21–22. Advising the GEB as to the format for reviewing this case does not constitute an intervention into the substantive issues involved in the review.

On the issue of Davis' advice to the GEB regarding prior GEB cases dealing with Article XIX, Section 2(d), plaintiffs accuse Davis of intentionally misleading the GEB about these cases. "Viewed most charitably to Ms. Davis, her response conveyed the wrong answer, flew in the face of the unambiguous language of Article XIX, Section 2(d), and misrepresented numerous existing Board decisions." Pls.Mot. for Summ.J. at 39. Despite plaintiffs' colorful accusations of Davis' unprofessional conduct, the court again concludes that "she answered the legal question to the best of her knowledge that GEB members put to her about the construction of Art. XIX, § 2(d), . . ." Plaintiffs have not offered evidence that Davis intentionally ignored prior opinions, nor have plaintiffs shown that Davis' statements significantly influenced the GEB's construction of the provision. Indeed the court previously noted that "[t]he GEB did not accept her word uncritically: Vice President Thibault voted to reject her recommended construction of Art. XIX, § 2(d). . . . [S]he did not unduly sway the GEB's decisions." *Yager II*, at 22. The court's inquiry turns on whether Davis' actions prejudiced plaintiffs to such an extent that she "seriously increased the risk" that the GEB would make an improper decision. *See Curtis*, 687 F.2d at 1030. That the court disagrees with Davis' interpretation of prior GEB cases does not give rise to the inference that she intentionally misled the GEB, nor does it negate the court's conclusion that she did not unduly influence the GEB's deliberations. The LMRDA does not permit the court to second guess or correct the errors of union officials.

Finally, plaintiffs claim that Davis' preexisting relationship with defendant Carey and her work on the Yager and Kaiser matter before the GEB reviewed the case constituted an impermissible bias against the plaintiffs as well as a conflict of interest for Davis.

In support of their claim, plaintiffs cite to two criminal cases where courts found impermissible conflicts of interest.

First, plaintiffs cannot sustain a claim of impermissible bias and taint simply by reciting Davis' relationship with defendant Carey. The transcript of the GEB's deliberations reveals that Davis "played no 'active part' in their deliberations." *Yager II*, at 21. As noted above, she assisted in the deliberations by providing advice when the members of the GEB requested such advice. Unlike the prosecutor in *Stein v. Mutuel Clerks' Guild of Mass., Inc.*, Davis did not take "an active part in the private deliberations. . . ." 560 F.2d 486, 491 (1st Cir.1977). Also, the court finds plaintiffs' conflict of interest argument unpersuasive. To begin, plaintiffs describe this court's opinion in *United States v. Harris*, 846 F.Supp. 121 (D.D.C.1994), but they in no way link that decision with the facts of this case. This is understandable in light of plaintiffs' reliance on *Harris* and *United States v. Gambino*, 864 F.2d 1064 (3d Cir. 1988), *cert. denied*, 492 U.S. 906, 109 S.Ct. 3215, 106 L.Ed.2d 566 (1989), criminal cases involving the sixth amendment guarantee of reasonably effective assistance of counsel. The standards governing judicial proceeding such as the right to counsel do not apply to union proceedings. *See Ritz*, 566 F.2d at 735. Moreover, the inquiry under the LMRDA is not whether a conflict of interest may have existed, but whether Davis' bias impinged upon the plaintiffs' right to a fair trial. The court has already found that Davis' actions did not unduly influence the GEB. As a result, plaintiffs' conflict of interest argument fails.

Accordingly, the presence and actions of Susan Davis did not deny plaintiffs their right to a full and fair trial.

(2) *Influence of Joseph Pass on the GEB*

 The court concluded above that Pass did not improperly influence the disciplinary hearing Panel. Plaintiffs further allege, however, that Pass presented the Panel's decision to the GEB and "participated" in its deliberations without the knowledge of at least two Panel members. These actions, claim plaintiffs, violated their right to a full and fair trial. However, aside from the facts

just stated, plaintiffs have not put forth any further evidence that Pass' behavior infected the GEB's deliberations with bias. Indeed a "review of the transcripts of the GEB deliberations shows that Pass played only a minor role in the GEB's decision-making." *Yager II*, at 23. The court now concludes that Pass did not exert an improper influence on the GEB.

### (3) *Political and Personal Opposition of GEB*

Finally, plaintiffs claim that the GEB's political and personal opposition to plaintiffs coupled with the fact that the GEB was the ultimate adjudicator of plaintiffs' guilt provides conclusive evidence that defendants denied plaintiffs' right to a full and fair trial under the LMRDA. In the context of the GEB's review, as with the other elements of plaintiffs' disciplinary hearing, plaintiffs must show specific instances of bias in order to establish that defendants denied their right to a full and fair trial. *See Frye*, 767 F.2d at 1225.

Plaintiffs allege that the GEB was biased in favor of defendant Carey in several ways. After reviewing the facts and allegations of plaintiffs, the court now finds that the GEB was not biased in violation of plaintiffs' right to a full and fair trial.

First, plaintiffs allege that defendant Perrucci, a member of the GEB, had a close relationship with defendant Carey that biased Perrucci in Carey's favor. For their specific allegations of facts, plaintiffs claim that Perrucci has known Carey for fifteen years, was a co-fiduciary of a Pension fund with him for eight years, campaigned on the Carey slate, and Perrucci received two committee appointments from Carey. These factual allegations are insufficient, as a matter of law, to establish Perrucci's bias.

Allegations of Perrucci's friendship and business association with Carey do not demonstrate a bias against Yager and Kaiser. Indeed, plaintiffs make no allegations that

Perrucci had contact with or animosity toward plaintiffs. Cases finding bias rely on more tangible instances of bias, typically found between the charged member and the tribunal member. In the *Goodman* case, for example, the court found that the accused member successfully stated a claim of bias when he had previously removed six of the seven tribunal members that convicted him from their position as shop steward. 742 F.2d at 784. In a similar manner, the court in *Tincher* found that the accused member had previously brought disciplinary charges against a member of the tribunal. 520 F.2d at 855. As a result, the court found impermissible bias. *Id.* As these cases indicate, accusations of bias arising out of conflict between a tribunal member and the accused carry far more danger of unfair bias than merely allegations of a general relationship between a tribunal member and the charging party. Plaintiffs' assertion of a general relationship between Carey and Perrucci fails to establish an improper bias.

Next, plaintiffs allege that defendant Morris, also a member of the GEB that reviewed plaintiffs' case, was improperly biased. Plaintiffs first claim that Morris prejudged plaintiffs' guilt. They point to deposition testimony of Morris and statements allegedly made by Morris [11] to conclude that he prejudged the guilt of Yager. Direct language from Morris is conspicuously absent from plaintiffs' summary judgment papers; although plaintiffs cite to a couple of pages of his deposition, plaintiffs do not quote, and the court cannot find, words that clearly indicate that Morris prejudged the guilt of Yager. Later, in the same deposition, Morris states that aside from rumors, he did not know that Yager had refused to appoint Lee as the Union Chair until the disciplinary Panel had heard the case. Even then, an understanding by Morris that the Panel found that Yager did not appoint Lee when asked to do so by Carey does not indicate that Morris prejudged the guilt of Yager under the Constitution.

---

11. Plaintiffs allege that Morris stated that he would "take out" the plaintiffs. Defendants point out that none of the references indicated in plaintiffs' summary judgment papers tie the statement to Yager and Kaiser. The court agrees

and finds that none of Morris' statements presented to the court by plaintiffs that were made before the GEB review of plaintiffs' case indicate that Morris prejudged their case or exhibited a bias against plaintiffs.

The court's conclusion that the evidence is insufficient to establish that Morris prejudged the guilt of Yager is reinforced by other cases in which a court found such prejudgment. For example, the court in *Perry v. International Longshoremen's Ass'n* found that three members of the tribunal had actually written statements of their belief in the charged parties' guilt. 638 F.Supp. 1441, 1449 (S.D.N.Y.1986). Also, in *Falcone*, a member of the tribunal testified later that he had directly asked the charged member to admit his "obvious" guilt to save him from an "unnecessary" trial. 420 F.2d at 1161.[12] Unlike these cases, plaintiffs cannot point to clear indications of prejudgment by Morris.

In a final effort to establish bias on the part of defendant Morris, plaintiffs quote the following statement made by Morris during the GEB's deliberations:

> ... I'm voting to take these people out, but if they don't have to pay for this remedy, they're going to be around again. They're going to build up an organization against you again ...

This court considered this statement in its previous opinion finding that

> Morris' comment was made after the GEB was already finished deliberating. His comment may reflects [sic] one GEB member's strong desire to punish plaintiffs severely, but Sister Kilmury argued just as strongly for lighter penalties. Contrary to plaintiffs' allegations, Morris' comment does not evidence any "blind rush" by the GEB to depart from the panel's findings and hit plaintiffs with harder penalties. Rather, it is evidence of appropriate deliberations by the GEB on the wisdom of punishing plaintiffs for insubordination.

*Yager II*, at 20. The court now reaches the same conclusion.

Finally, plaintiffs argue that the GEB's decision to review the Panel's decision de novo and ultimately to disregard the Panel's decision to dismiss four charges against Yager evidences a bias against plaintiffs. However, as the court previously concluded, the facts surrounding the GEB's review does not indicate that the review was permeated by political bias. *Yager II*, at 19. The strongest political opponents of Yager and Kaiser did not take part in the GEB's deliberations and decision. The four members who had an interest in or knowledge of the case recused themselves. Also, as the court has indicated above, Diana Kilury presented a "strong dissenting voice," urging all GEB members to speak up on the issue of the heavier penalty. Finally, because the court finds that the other allegations of bias against Perrucci and Morris are unfounded, the de novo review itself does not provide a specific factual allegation of bias denying plaintiffs a full and fair trial.

Overall, plaintiffs seek to have the court set aside the GEB's and the Panel's decisions without providing a proper foundation to do so. The LMRDA does not give this court the opportunity to second guess the union and substitute the court's own judgment in its place. Each part of the disciplinary process, while perhaps not a model for future cases, did ensure that plaintiffs' basic rights were protected. Under the LMRDA, plaintiffs are entitled to no more than this.

## B. *Free Speech and Retaliation*

Plaintiffs contend in the first three counts of their amended complaint (No. 93–1054) and in the second count of their second complaint (No. 93–1970) that defendants infringed plaintiffs' right to free speech and improperly retaliated against them in violation of sections 101(a)(2) and 609 of the LMRDA. 29 U.S.C.A. § 411(a)(2), 529 (1985). Defendants have moved for summary judgment on all four counts, claiming that the charges brought against plaintiffs and the subsequent discipline imposed were aimed solely at their conduct, not their speech. The court agrees.

---

12. " 'We asked Mr. Falcone to simply admit his guilt because it was obvious that it appeared by the evidence that he was guilty by all evidence possible, and that if he were to admit his guilt and save us all the necessity of a trial, of a hearing, that the penalty in all likelihood would be much lighter than possibly what it might be if we went to trial, went to hearing.' " *Falcone*, 420 F.2d at 1161 (*quoting* App. at 25).

Sections 101(a)(2) of the LMRDA protects the free speech and assembly rights of union members. The statute provides:

Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings....

29 U.S.C.A. § 411(a)(2). Additionally, the LMRDA prohibits a labor organization from disciplining its members for exercising that free speech right.

It shall be unlawful for any labor organization, or any officer, agent, shop steward, or other representative of a labor organization, or any employee thereof to fine, suspend, expel, or otherwise discipline any of its members for exercising any right to which he is entitled under the provisions of this chapter.

29 U.S.C.A. § 529.

### 1. *Free Speech*

On the issue of free speech, courts distinguish between the rights of a union member and the rights of appointed or elected union officials under the LMRDA. *See Finnegan v. Leu,* 456 U.S. 431, 102 S.Ct. 1867, 72 L.Ed.2d 239 (1982) (finding that Congress sought to protect the rank-and-file members, not union officers, with the LMRDA). Although a union member does not surrender his right to free speech by accepting appointment or election to union office, a union official has certain duties toward the organization and its leadership. These duties are even more pronounced when, as here, that leadership was elected by the rank-and-file according to democratic procedures. *See Newman v. Local 1101, Communications Wkrs.,* 570 F.2d 439, 445 (2d Cir.1978). As that court stated,

Although a person is free as a union member to criticize mercilessly his union's management and its policies, once he accepts a union position obligating him fairly to ex-

plain or carry out the union's policies or programs, he may not engage in conduct inconsistent with these duties without risking removal as an official or employee (but not as a union member) on the ground that his conduct precludes his effective representation of the union.

*Id.* at 445. Thus, while the union leadership may not use internal disciplinary proceedings as a means to suppress the speech of union members, union officials may not avoid discipline when they have engaged in conduct that violates union rules or policy by seeking refuge in the LMRDA.

In this case, plaintiffs did not merely express disagreement with the policies pursued by defendants, they openly defied those policies. The uncontroverted evidence presented in the pleadings and motions demonstrates that Yager and Kaiser refused to implement the direct orders from the General President. Carey brought internal union charges alleging that such refusal constituted conduct, not speech, in violation of the union constitution. Unless the disciplinary action against plaintiffs had the purpose or effect of suppressing or chilling their free speech rights, or the free speech rights of other union members, then the LMRDA does not make such discipline illegal. *Newman,* 570 F.2d at 445; *cf. Wisconsin v. Mitchell,* 508 U.S. 476, ——, 113 S.Ct. 2194, 2199, 124 L.Ed.2d 436 (1993) (*citing United States v. O'Brien,* 391 U.S. 367, 376, 88 S.Ct. 1673, 1678, 20 L.Ed.2d 672 (1968); *R.A.V. v. St. Paul,* 505 U.S. 377, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992)).

Plaintiffs dispute the characterization of their actions as conduct and not speech, and they attempt to analogize their situation to that of the plaintiff in *Dessler v. Teamsters, Chauffeurs, Warehousemen & Helpers of Am., Local Union No. 251,* 686 F.Supp. 977 (D.R.I.1988). Plaintiffs' reliance on *Dessler* is misplaced. In that case, the union leadership censured a member for writing a letter to the editor of a local newspaper in which he opposed a position taken by his local's leadership. 686 F.Supp. at 978. In response to defendants' motion to dismiss, the court decided that the plaintiff had stated a cause of action under section 101(a)(2) as the official

censure could be shown to have been a part of a deliberate attempt to suppress dissent. *Id.* at 980–81 (*citing Adams–Lundy v. Association of Professional Flight Attendants,* 731 F.2d 1154, 1159 (5th Cir.1984), *rehr'g denied,* 736 F.2d 1526 (1984)).[13] Plaintiffs differ from Dessler in two critical respects. First, Yager and Kaiser did not oppose union policy merely by sending a letter to a newspaper; they flatly refused to follow the orders of the General President and the GEB. Second, Dessler, unlike Yager and Kaiser, was not a union official charged with furthering union policy. As the court in *Newman* indicated, a union official risks removal from office when that official defies the duties imposed by virtue of his position. 570 F.2d at 445 ("[A union officer] may not, while acting as the union's agent, sabotage or subvert its policies in the name of free speech.").

Plaintiffs attempt to save their free speech claims by maintaining that the internal charges brought against them were part of a plan by defendants to suppress speech throughout the Teamsters. *See, e.g., Adams–Lundy,* 731 F.2d at 1159. To avoid summary judgment, plaintiffs point to statements and actions of Carey and the GEB that plaintiffs believe establish a disputed issue of fact as to whether defendants have engaged in such a plan.

In order to sustain their claim that the charges leveled against plaintiffs were part of an overall plan to suppress dissent in the Teamsters, plaintiff must provide clear and convincing evidence that the union action was "part of a purposeful and deliberate attempt by union officials to suppress dissent within

the union." *Newman,* 570 F.2d at 445–46 (*quoting Schonfeld v. Penza,* 477 F.2d 899, 904 (2d Cir.1973)); *Dessler,* 686 F.Supp. at 980–81. The evidence relied on by plaintiffs fails to meet this standard. None of the evidence, taken in the light most favorable to plaintiffs, implies the existence of a plan to suppress dissent within the membership of the Teamsters. The statements, as discussed below, indicate that the GEB recognized that it may face difficulties in obtaining the cooperation of all Teamster officials in pursuing its policies. Plaintiffs assume that the GEB's plans to get such cooperation represent an overall plan to crush legitimate dissent. However, as long as the GEB was entitled to such cooperation in the form of its officials following legitimately issued orders, the voicing of the intention to obtain that cooperation cannot constitute a violation of the LMRDA.

Plaintiffs point to three categories of "significant probative evidence" supporting their complaint. The first of these consists of six excerpts, spanning nearly a year, of statements from the minutes of meetings of the GEB. Most refer to the GEB's attempts to obtain the cooperation of local and area officials with respect to the reform of various grievance panels or the presence of representatives of the International at local and area meetings. Several of the statements indicate that the GEB found Yager to be a thorn in its side. The court finds that the statements do not, however, suggest the further step that Carey or the GEB had a plan to obtain the desired cooperation by suppressing speech.[14] Ultimately, six general statements

---

**13.** The plaintiff in *Dessler* also alleged that the union improperly disciplined him under section 609 of the LMRDA. However, the court dismissed that claim because the official censure was not "discipline" within the meaning of the LMRDA.

The court also notes that *Dessler* addressed the issue in the context of a motion to dismiss. The court gave no indication of the evidence that would be necessary to prove that union engaged in a plan to suppress free speech.

**14.** A single statement by defendant Carey appears to suggest the possibility of some future improper means of obtaining cooperation. The plaintiffs quoted the statement as follows:

Now this is clear that one key element of our platform was to make sure that fairness and

justice is done on some of the grievance panels—we are having some problems trying to get confidence and enthusiastic responses from some of the people who control some of these panels and I am trying my best to get it done in the proper way. But as it is with old things, patience runs out. . . .

Pls. Mot. for Summ. J. at 53. First, plaintiffs cast the final sentence's "all" things as "old," but the difference is immaterial. However, the court believes that plaintiffs' failure to quote Carey's entire statement is material. As defendants indicate, Carey continued his statement with:

But as it is with all things, patience runs out and I would hope that we could get the kind of results that from what I understand is the right kinds of justice for our members without, you

pulled out of volumes of GEB transcripts cannot prove a deliberate attempt by defendants to suppress dissenting speech within the Teamsters.

The plaintiffs label their second category of evidence "Suppression of Dissent in the Eastern Conference." Assuming that the actual suppression of speech within another area conference could raise a jury issue as to whether the internal charges and discipline against Yager and Kaiser were part of a plan to suppress dissent, the incidents upon which plaintiffs rely do not represent such suppression.

Plaintiffs present two instances of alleged suppression of dissent within the Eastern Conference. The first arose from a dispute between Carey and the Chair of the Atlantic Area United Parcel Service Supplemental Negotiating Committee. At the time, the Teamsters were preparing for upcoming national contract negotiations with UPS. Carey attempted to appoint Ken Hall as co-chair of the committee. John Steger, the current chair, opposed this appointment in a letter to Carey. Defendant Mario Perucci then contacted Philip Feaster, president of Steger's local. Perucci requested that Feaster intervene with Steger on Carey's behalf. Feaster refused to do so, and Perucci allegedly stated that he would like to "kick Steger's fucking ass," and allegedly threatened that the International would "declare war" on the locals in the Atlantic Area.

Assuming that these allegations are true, as the court must for purposes of deciding this motion, the incident does not constitute evidence of an existing plan by Carey and the GEB to suppress free expression within the Teamsters. Feaster defended in writing the "right to dissent against decisions at the International Union," no charges were ever filed against anyone, and Steger remains on the negotiating committee to this day.

As further evidence of the suppression of dissent within the Eastern Conference, plaintiffs point to charges brought by Carey against the Eastern Conference Policy Committee. Carey's Personal Representative to the Eastern Conference, James Smith, brought these charges against Eastern Conference officials for refusing to provide the International Union with copies of various financial documents. Like Yager and Kaiser, these union officials faced charges not for speaking out against Carey and the GEB, but for refusing to implement directives issued by defendants. When the Conferences sought a preliminary injunction against these charges on the grounds of illegal retaliation in violation of section 101(a)(2) of the LMRDA, Judge Edelstein of the Southern District of New York denied their request and found that plaintiffs therein had no likelihood of success on the merits of their free speech and retaliation claims. As with the charges brought against Yager and Kaiser, these charges do not represent the suppression of the free speech rights of members of the Teamsters.

The third and final category of evidence proffered by plaintiffs consists of defendants' actions toward the Central Conference. First, plaintiffs allege that a set of proposed charges that defendant Belk prepared against the Central Conference illustrate defendants' "automatic response to any opposing view." Belk prepared the charges, but never filed them, after Yager wrote a letter to Belk challenging his authority to investigate questionable ethical practices under the International Constitution. However, as defendants point out, Belk never filed the charges, and Yager never received a copy of the proposed charges. Accordingly, no suppression occurred, and the court cannot infer attempted suppression of dissent throughout the Teamsters.

Finally, plaintiffs call the court's attention to a message sent by Carey to the Central Conference (as well as the other three conferences) regarding Carey's recent attempt to disband the conferences. Upon review of

know, making a big deal out of it. I may be wrong about that but I am going to continue to try. Just how long I can't give you an answer on that. *Id.* Contrary to plaintiffs' assertion, Carey's statement seems to indicate a continued effort to get cooperation through proper means. In any event, the entire statement does not support plaintiffs' claim that Carey and the defendants engaged in conduct designed to suppress speech. Moreover, Carey never mentions Yager in this passage.

this message, the court finds, however, that it expressly acknowledges the Conference's right to freely debate and discuss the proposal. It goes on to warn that Carey would not tolerate any actions in contravention of the IBT Constitution or the authority given to Carey and the GEB. Such a statement represents little more than a reminder of the duties imposed on conference officials by virtue of their positions. Demanding compliance with the rules does not amount to suppression of dissent. Even when viewed in a light most favorable to the plaintiffs, the court finds that the facts do not support plaintiffs' suppression claim.

### 2. Retaliation

■ As indicated, section 609 of the LMRDA prohibits defendants from disciplining plaintiffs in retaliation for plaintiffs' filing of the Michigan suit. As the D.C. Circuit indicated in *Ritz v. O'Donnell*, "[s]ection 609 clearly prohibits a union from penalizing its members because they have exercised their rights of free speech and assembly, and the courts have not hesitated to nullify disciplinary actions that have infringed upon those rights." 566 F.2d at 736 (*citing Kuebler v. Cleveland Lithographers and Photoengravers Union Local 24–P*, 473 F.2d 359 (6th Cir.1973)). In *Ritz*, the court indicated that selective prosecution, for example, may evidence retaliation. *Id.*

The court finds that the facts surrounding the filing of Carey's charges do not provide any basis for arguing that the charges were filed in retaliation for the Michigan action. The dispute between Carey and plaintiffs predated the Michigan action, and Carey did not bring charges against the plaintiffs until nearly two months after the plaintiffs had filed suit in Michigan. Prior to the filing of Carey's charges, the Michigan judge had already appointed Lee as the interim Union Chairperson. In other words, defendants had already won the first round of the Michigan litigation, and this round strongly indicated that the court would ultimately rule in defendants' favor. Despite these facts as recited by the court, plaintiffs offer no substantive factual allegations to support their claim of retaliation.[15] This court is not willing to allow plaintiffs to proceed under a retaliation theory based solely on the fact that Carey leveled his charges after plaintiffs had filed suit in Michigan.

### 3. Improper Discipline

■ Following the removal from their union offices, plaintiffs allege that this punishment amounts to unlawful discipline under section 609 of the LMRDA. Such an allegation is contrary to the Supreme Court's interpretation of the rights protected under section 609. In *Finnegan v. Leu*, the Supreme Court held that section 609 of the LMRDA protected union members, not union officers. "It is readily apparent, both from the language of these provisions and from the legislative history of Title I, that it was rank-and-file union members—not union officers or employees, as such—whom Congress sought to protect." *Finnegan*, 456 U.S. at 436–37, 102 S.Ct. at 1871. In that case, the Court when on to find that defendant's discharge of

---

**15.** In an effort to show that summary judgment is inappropriate at this time, plaintiffs argue that defendants have not produced certain documents that may show retaliatory evidence. In particular, plaintiffs allege that defendants created fourteen documents between the time plaintiffs filed the Michigan suit and the day Carey filed his charges. Plaintiffs aver that defendants, claiming work-product and attorney client privileges, have not produced them, and that these documents may contain information that establishes retaliation. These documents are part of an outstanding motion to compel production of documents. The court first finds that as a factual matter, only two documents listed on defendants' current privileged documents list fall within the time frame cited by plaintiffs. Even though plaintiffs have not had access to those two docu-

ments, this court is unwilling to accept plaintiffs' unsupported assertion that the two documents could provide retaliatory evidence. The only link to retaliation that plaintiffs allege is that the defendants created the documents after plaintiffs filed the Michigan suit and before Carey filed his charges. This bare allegation cannot support plaintiffs' claim. Under Federal Rule of Civil Procedure 56(f), the Rule that allows this court to delay ruling on a summary judgment motion pending further discovery, plaintiffs must demonstrate that further discovery is necessary to defend defendant's summary judgment motion. *Strang v. United States Arms Control & Disarmament Agency*, 864 F.2d 859, 861 (D.C.Cir.1989). As a result, plaintiffs' request for further discovery shall be denied.

union employees who happen to also be union members did not implicate the LMRDA because their discharge from union employment did not affect their status as union members. *Id.* at 438.

The court now finds that plaintiffs' claim of improper discipline under section 609 of the LMRDA must fail. The discipline imposed on plaintiffs consisted solely of removing them from their union office and had no impact on their union membership. The case of *Sheet Metal Workers' Int'l Ass'n v. Lynn,* 488 U.S. 347, 109 S.Ct. 639, 102 L.Ed.2d 700 (1989), does not change the analysis. In that case, the International removed an elected union official for speaking out against the International's position. The ex-official sued the International under sections 101(a)(2) and 102 of the LMRDA, the free speech provisions. The Supreme Court found that because the official was elected by the members, not appointed, he had a cause of action under the LMRDA for his removal. 488 U.S. 347, 353, 109 S.Ct. 639, 644 (1988). First, *Lynn* analyzed a claim under the free speech provisions of the LMRDA, not section 609. Accordingly, *Finnegan*'s conclusion that section 609 does not redress the loss of a union office remains unchanged. Also, neither Kaiser nor Yager were elected by the rank-and-file to their positions. Accordingly, *Lynn* does not alter the court's conclusion.

The court would also note that even if section 609 purported to redress the loss of union office, plaintiffs' claim would still fail in light of the court's conclusions above that Carey properly brought the disciplinary actions and did not violate the free speech rights of plaintiffs. As a result, the discipline imposed under the legitimate charges is not improper.

## C. *Section 501 of the LMRDA and the Declaratory Judgment Act*

Count Five of plaintiffs' Amended Complaint (No. 93–1054) alleges that defendants violated section 501 of the LMRDA by (1) amending the IBT Constitution without proper authorization, (2) using union funds to finance a public relations campaign against plaintiffs in violation of their free speech rights, and (3) self-dealing with respect to a union pension fund, the Teamster Affiliates Pension Plan. Count Seven of plaintiffs' Amended Complaint alleges that plaintiffs are entitled to a declaratory judgment under the Declaratory Judgment Act, 28 U.S.C.A. § 2201(a) (1994), declaring the March 7, 1993, amendment to the IBT Constitution invalid on the ground that the GEB's decision was unreasonable and contrary to the Constitution. Defendants move for summary judgment on these counts on procedural as well as substantive grounds.

### 1. *Section 501 of LMRDA*

Section 501(a) of the LMRDA defines the fiduciary duty of officers, agents, and other representatives of labor organizations, requiring each person to hold union money and property for the sole benefit of the union and its members. 29 U.S.C.A. § 501(a). In the event that the union or the governing body of the union fails to seek appropriate relief against a person alleged to have violated this fiduciary duty, subsection b permits any individual member of the union to sue that person for the benefit of the organization. *Id.* at § 501(b). Plaintiffs now seek to bring an action against defendants under this provision.

#### a. *Request Required*

The first ground asserted by defendants for summary judgment is that plaintiffs have failed to comply with section 501(b)'s procedural requirement that an individual seeking to sue for a violation of subsection (a) must first request that the union or its governing body bring the action. Only in the event that the union refuses or fails to bring the action may the individual proceed to file suit. 29 U.S.C.A. § 501(b). In other words, until the union denies a member's request that the union bring the action, that member has no standing to sue. The parties do not dispute that plaintiffs never requested that the Teamsters or any of its officials bring suit against Carey or any of the defendants. Plaintiffs do however argue that under section 501(b), they were excused from making such a request because the request would be futile.

In its previous opinion, the court left open the question of whether the "futility doctrine" could excuse plaintiffs from the statute's request requirement. *Yager I*, at 20, n. 5. At that time, plaintiffs did not argue that futility could excuse the requirement, and the court refused to consider it *sua sponte*. *Id.* Because plaintiffs now make this argument, the court will consider the issue.

In this jurisdiction, the D.C. Circuit refused to decide whether futility excused the request requirement in section 501(b) of the LMRDA. *See Quinn v. DiGiulian,* 739 F.2d 637, 653 (D.C.Cir.1984) ("We thus affirm this order without deciding whether the district court's interpretation of . . . the jurisdictional . . . provision[ ] of section 501 is correct."). District courts in this jurisdiction have arrived a different conclusions. The district court in *Quinn,* for example, excused the plaintiff from the request requirement because (1) he brought the suit in good faith, (2) the request would have been futile, and (3) he had presented the claim to the union president and requested action on his behalf. *Quinn v. DiGuilian,* 97 Lab.Cas. ¶ 10,163, 1983 WL 2005 (D.D.C.1983). However, in *O'Connor v. Freyman,* Judge Johnson of this court held that futility would not excuse section 501(b)'s requirement that a member first request that the union bring the action. 112 Lab.Cas. ¶ 11,485, 1985 WL 121 (D.D.C.1985) (*citing, Coleman v. Brotherhood of Ry. & Steamship Clerks,* 340 F.2d 206, 208 (2d Cir. 1965) ("[T]he provision of the statute [requiring demand to sue] is mandatory and . . . its requirements cannot be met by anything short of an actual request. An allegation of the futility of such request will not suffice.")). That opinion relied on this court's earlier decision in *International Bhd. of Teamsters v. Hoffa,* 242 F.Supp. 246, 248–49 (D.D.C. 1965), where the court found that two members of the union who did not join in the request that union officers bring the action had no standing to sue under section 501(b).

▮ The court now holds that some form of request that the union or a governing member of the union bring the action is a requirement that cannot be waived as futile. The court finds, as the D.C. Circuit acknowledged, that the district court in *Quinn* based its holding at least in part on the fact that the plaintiff had sent a letter to a union official requesting that a suit be filed. *Quinn,* 739 F.2d at 652, n. 27. In this case, neither Yager nor Kaiser requested any Teamster official to initiate a section 501(a) action against the defendants. Under these circumstances, the court now holds that plaintiffs have no standing to raise count five, and accordingly, the court shall dismiss that count.

### 2. *Substance of Plaintiffs' 501 allegations*

In light of the uncertainty surrounding the request requirement of section 501(b), the court now finds that even if plaintiffs have standing to bring this claim, it must fail on the merits. This court previously determined section 501(a) only covers actions for violations of financial fiduciary claims. *Yager I*, at 20 (*citing Quinn,* 739 F.2d 637 (D.C.Cir. 1984)); *see also Coleman,* 340 F.2d at 209 (holding that section 501 "applies to fiduciary responsibility with respect to the money and property of the union and that it is not a catch-all provision under which union officials can be sued on any ground of misconduct with which the plaintiffs choose to charge them."). In light of this court's earlier opinion, plaintiffs have attempted to reformulate their various allegations to state violations of financial fiduciary duties. As the discussion below indicates, however, the court again rejects each claim.

#### (a) *Amending the IBT Constitution*

▮ Plaintiffs allege that defendants violated their fiduciary duty under section 501(a) by unconstitutionally amending the IBT Constitution in March of 1993. Because plaintiffs do not rebut defendants' claim that this allegation does not involve financial fiduciary duties, the court now holds that plaintiffs cannot maintain this allegation under section 501(a).

#### (b) *Public Relations Campaign against Plaintiffs*

▮ Plaintiffs next assert that defendants' expenditure of funds on an aggressive public relations campaign against plaintiffs in violation of their right to free speech, violates section 501(a). However, the D.C. Circuit

has cautioned that section 501(a) should not be duplicative in the sense that it would protect rights already protected by other sections of the LMRDA. *Quinn,* 739 F.2d at 653, n. 30.[16] As indicated earlier in this opinion, a member's right to free speech is protected by section 101(a)(2) of the Act, and the court found that defendants did not impinge upon plaintiffs' free speech rights. *Head v. Brotherhood of Ry., Airline and Steamship Clerks, Freight Handlers, Express and Station Employees,* 512 F.2d 398, 400 (2d Cir.1975) (dismissing plaintiff's complaint under section 501 because the monetary element was of "secondary importance"). This court will not now read section 501(a) to provide a duplicative cause of action for what plaintiffs believe to be a denial of their free speech rights. The underlying claim, that the campaign violated plaintiffs' free speech rights, is the real violation alleged. This right is already protected by the free speech provisions of the LMRDA, and plaintiffs cannot also sue under section 501(a).

### (c) *Teamster Affiliates Pension Plan*

■ Plaintiffs finally allege that defendant Carey has engaged in self-dealing with respect to the Teamster Affiliates Pension Plan.[17] As the affidavit of Richard Jasper, the Administrative Manager of the Plan, indicates, the Plan is a pension plan for officers and employees of affiliates of the IBT. The Plan is funded by the IBT on behalf of its affiliates. Mr. Jasper goes on to state that once the IBT makes a payment to the Plan, "that money belongs to the Affiliates Plan and is no longer IBT property." Defendant Carey, as General President, is a Trustee of the Plan.

Defendants assert, and plaintiffs have not disputed, that the "money belongs to the Affiliates Plan and is no longer IBT property." Section 501 only applies to activities affecting union money. *See McNamara v.*

*Johnston,* 522 F.2d 1157, 1163 (7th Cir.1975), *cert. denied,* 425 U.S. 911, 96 S.Ct. 1506, 47 L.Ed.2d 761 (1976). Because the money in the Plan was no longer the property of the union, plaintiffs have no standing to raise this claim.

### 2. *The Declaratory Judgment Count*

Plaintiffs allege in Count Seven of their amended complaint that they are entitled to a declaratory judgment declaring the defendants' March 7, 1993, amendments to the IBT Constitution void. Plaintiffs assert that the amendment which purported to give defendant Carey the power to appoint Charles Lee as the Union Chair of the Joint Committee violates Article XXII, section 3(d) of the IBT Constitution. That section states that the GEB cannot modify the rights and duties of an incumbent officer. Plaintiffs argue that by amending the Constitution, defendants modified Yager's rights, because plaintiffs believe he originally possessed the power to appoint to that office. Because the GEB's amendment violated this provision, plaintiffs argue, the court should void the amendment. However, the court finds that because the GEB's interpretation of the IBT Constitution was reasonable, it is entitled to judicial deference and the court will not void the amendment.

■ As the Ninth Circuit discussed in *Lucas v. Bechtel Corp.,* so long as a union's interpretation of its own constitution is reasonable and in good faith, that interpretation is entitled to considerable judicial weight. 800 F.2d 839, 849–51 (9th Cir.1986). In this case, plaintiffs' only allegation that the GEB's interpretation of the IBT Constitution was unreasonable stems from their argument that Yager originally had the right to appoint the Union Chair of the Joint Committee. In all respects this begs the question. According to plaintiffs, *assuming* that Yager originally had the authority to appoint the Union

---

**16.** Furthermore, the district court's construction of section 501 to encompass protection of members' section 101 rights results, as far as we can tell, in protection duplicative of that afforded by section 101 itself. Nothing in the language, legislative history or purpose of section 501 seems to us to require such redundancy.

*Quinn,* 739 F.2d at 653, n. 30.

**17.** In their summary judgment motion, defendants remind the court that plaintiffs only identified the Teamster Affiliates Pension Plan as the plan with which defendants engaged in self-dealing.

Chair before the amendment, the GEB's decision to disregard this would be unreasonable. However, the real conclusion that this court must consider is whether Yager had the right in the first place. The GEB considered the issue and concluded that Carey, not Yager, had that power all along. Under this interpretation, defendants did not violate the Constitution because Yager never had the right to appoint the position. Plaintiffs have not proffered evidence to show that *this* conclusion was "patently" unreasonable or made in bad faith. *See Nelson v. International Ass'n of Bridge etc.*, 680 F.Supp. 16, 21 (D.D.C.1988). Accordingly, this court gives that interpretation considerable deference, and concludes that plaintiffs are not entitled to a declaratory judgment.

## D. *ERISA*

In the sixth count of plaintiffs' amended complaint (No. 93–1054), plaintiffs allege that defendant Carey violated portions of the Employee Retirement Income Security Act, 29 U.S.C.A. §§ 1001–1461 (1985 & West Supp. 1995). Defendants have moved for summary judgment, asserting that plaintiffs' claim must fail for procedural and substantive reasons. The court agrees that plaintiffs have not stated a claim on which the court can grant relief, and it shall accordingly dismiss count six.

■ Under ERISA, a civil action may be brought by a beneficiary of a pension plan against a plan fiduciary for breach of the plan fiduciary's duty to the plan, 29 U.S.C.A. § 1132(a)(2), or to obtain appropriate equitable relief, 29 U.S.C.A. § 1132(a)(3). As the Supreme Court has made clear, an individual beneficiary is not entitled to individual money damages; all recovery shall be for the benefit of the plan or in the form of equitable relief. *See Massachusetts Mutual Life Ins. Co. v. Russell*, 473 U.S. 134, 140–42, 105 S.Ct. 3085, 3089–90, 87 L.Ed.2d 96 (1985); *Mertens v. Hewitt Associates*, 508 U.S. 248, 260–

63, 113 S.Ct. 2063, 2071–72, 124 L.Ed.2d 161 (1993) (holding that money damages are not available under section 1132(a)(3)).

Both sides appear to agree that the Teamster Affiliates Pension Plan is a welfare or pension plan within the meaning of ERISA.[18] *See* 29 U.S.C.A. § 1002. Plaintiffs aver and defendants do not dispute that defendant Carey is a fiduciary of the Teamster Affiliates Pension Plan. In April of 1992, an employee of the Segal Company, one of the Plan's existing service providers, made a financial contribution to the Committee to Elect Ron Carey ("CERC"), and plaintiffs allege that this contribution violated Carey's fiduciary duties as trustee of the Plan under ERISA.

■ Defendants contend that because the plaintiffs seek only civil penalties and attorneys fees, this court must dismiss this claim under Federal Rule of Civil Procedure 12(b)(6). As Plan beneficiaries, plaintiffs are not entitled to civil penalties.[19] *See* 29 U.S.C.A. §§ 1132(a)(6) & (i). The plaintiffs' amended complaint contains the following language:

> 64. By reason of these violations, Plaintiffs, as beneficiaries to the plans, seek the appropriate civil penalties, plus attorneys fees and costs pursuant to 29 U.S.C. §§ 1132 and 1109.

Am.Compl. ¶ 64. However, plaintiffs are not entitled to the relief they seek, that is, civil penalties. Plaintiffs do not state that they seek equitable relief for the Plan; plaintiffs do not state that they seek monetary damages for the Plan. Plaintiffs seek only civil penalties, and, under the statute, the Secretary of Labor is the sole party that may collect civil penalties. *Id.* at § 1132(i). As a result, plaintiffs have failed to state a claim and the court shall dismiss count six pursuant to Federal Rule of Civil Procedure

---

18. Based upon the parties' representations in their summary judgment papers, the court finds that plaintiffs' ERISA count is based solely upon Carey's dealings with the Teamster Affiliates Pension Plan. However, because the court shall dismiss plaintiffs' ERISA complaint under Federal Rule of Civil Procedure 12(b)(6), it becomes

irrelevant if plaintiffs later argue that Carey has violated ERISA with respect to any other plans.

19. Only the Secretary of Labor may recover civil penalties. *See* 29 U.S.C.A. § 1132(a)(6) & (i).

12(b)(6).[20] *Accord Gray v. Baier,* 721 F.Supp. 326, 327–28 (D.D.C.1989) (dismissing plaintiff's ERISA claims that sought individual recovery rather than recovery for the Plan).

### E. *Further Discovery*

Plaintiffs ask the court to find that they are entitled to further discovery before the court rules on defendants' motion for summary judgment.[21] Plaintiffs believe that defendants have not been forthcoming with discovery, and, if allowed to continue, such discovery will yield further proof of their claims. Yet, the court finds that the discovery sought by the plaintiffs will not support any of their remaining claims, thus the court shall decide the case without further discovery.[22]

Plaintiffs primarily seek further discovery of information relating to Carey and his alleged mishandling of union funds or his improper solicitation of contributions to pay off campaign debts. To this end, plaintiffs attempt to bring their case into alignment with allegations raised in *Time* and *Business Week* articles claiming that while Carey solicited donations to pay off campaign debts, he made "extensive" purchases of real estate with "borrowed" money. Pls.Mot. for Summ.J. at 68. Plaintiffs believe that, "[a]t a minimum, these [and other] facts raise questions as to the propriety of Carey's actions

regarding the resources of the Teamsters." However, this case is about the causes of action pled in plaintiffs' complaints, not allegations in magazines. Thus, the court finds that the information sought is irrelevant in that it does not support any of plaintiffs' remaining claims in this case.

In their complaints, the plaintiffs' only allegations regarding Carey and his financial dealings are their section 501 and ERISA claims. Plaintiffs' allege that Carey violated section 501 of the LMRDA in his capacity as General President, and that he violated ERISA in his capacity as trustee of the Teamster Affiliates Pension Plan. The court today held that plaintiffs' cannot bring an action under section 501 of the LMRDA because they failed to first request that the IBT bring the action. The court further held that even if futility excuses this requirement, plaintiffs' three allegations fail as a matter of law.[23] Moreover, this court held that all facts surrounding the Teamster Affiliates Pension Plan are irrelevant because the court today dismissed plaintiffs' ERISA claim stemming from Carey's position as the trustee of the Plan. Also, the court held that the funds in the Plan are not IBT funds, thus Carey cannot be liable under section 501 for any alleged misuse of those funds. As a result, all plaintiffs' claims regarding Carey's

---

**20.** Plaintiffs have had ample opportunity to correct this pleading error, but they have elected not to do so. In light of the clear and unambiguous language of the ERISA statute, the court does not look favorably upon the plaintiffs' decision not to correct this error.

**21.** Because plaintiffs moved for summary judgment on their full and fair trial claims, they concede that there is no material factual dispute on that issue. Accordingly, any discovery relating to these claims cannot provide a basis for plaintiffs' claim that additional discovery is necessary before summary judgment may be granted.

**22.** In February of 1994, plaintiffs moved to compel the production of documents that defendants claimed were privileged under the attorney-client privilege or the attorney work-product privilege. The court finds that this outstanding motion will not prohibit the court from granting summary judgment in favor of defendants. First, because plaintiffs have moved for summary judgment on their full and fair trial claims, any documents pertaining to that claim cannot now prevent this court from granting summary judgment in favor

of defendants. Also, as discussed below, no additional information on the plaintiffs' other claims can prevent the court from finding, as a matter of law, that defendants are entitled to summary judgment. Consequently, the plaintiffs' outstanding motion to compel production of documents cannot serve as a basis for denying defendants' motion for summary judgment pending further discovery.

**23.** The court found that amending the constitution without proper authorization did not implicate section 501 because it did not involve union funds. Next, the court found that plaintiffs' claim that union funds were used to finance a public relations campaign to squelch plaintiffs' free speech rights was covered by the free speech section of the LMRDA and could not also fall under section 501. Finally, the court held that because the funds in the Pension Fund were no longer IBT funds, Carey could not be liable for self-dealing with respect to those funds under section 501 which requires the misuse of union funds.

alleged misuse of union funds have either been dismissed or disposed of as a matter of law. No amount of discovery on these issues can alter this result. Because plaintiffs have not alleged that further discovery will disclose facts material to validly pled and remaining claims, the court will not allow such discovery, and the court shall grant summary judgment in favor of defendants.

Finally, plaintiffs make no specific allegations that further discovery will uncover evidence in support of plaintiffs' free speech and retaliation claims. *See First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 298, 88 S.Ct. 1575, 1597, 20 L.Ed.2d 569 (1968) (requiring a party to describe with specificity the information sought in further discovery to oppose a summary judgment motion). Furthermore, under Federal Rule of Civil Procedure 56(f), which permits a party to delay summary judgment pending further discovery, speculative and irrelevant discovery cannot serve as a basis for delaying summary judgment. *See Strang*, 864 F.2d at 861. As with plaintiffs' claims stemming from Carey's financial dealings, no amount of discovery can alter the court's conclusion, based upon the undisputed underlying facts, that the IBT disciplined plaintiffs because of their conduct, not their speech. In this way, any discovery on this subject becomes irrelevant. This analysis combined with plaintiffs' absence of specificity regarding the information sought leads the court to hold that further discovery is not warranted.

Hence, the court now concludes that plaintiffs are not entitled to further discovery before this court rules on defendants' motion for summary judgment.

F. *Motion to Amend Plaintiffs' Second Complaint*

■ Subsequent to defendants filing of their summary judgment motion, plaintiffs moved to amend their complaint in Civil Action Number 93–1970, by adding an additional count of breach of contract. In *Monroe v. Williams*, this court discussed the standards for amending a complaint under Federal Rule of Civil Procedure 15(a). 705 F.Supp. 621, 623 (D.D.C.1988) (Lamberth, J.). "[A] party may amend the party's pleading only

be leave of court or by written consent of the adverse party ... and leave shall be freely given when justice so requires." Fed. R.Civ.P. 15(a). The Supreme Court gave meaning to the phrase "when justice so requires" in the case of *Foman v. Davis*, 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). The Court stated that although the grant or denial of an opportunity to amend is within the discretion of the court, "outright refusal to grant leave without any justifying reason ... is not an exercise of discretion." *Id.* at 182, 83 S.Ct. at 230. For example, when a court finds undue delay, bad faith, dilatory motive, or prejudice to the opposing party, the court may deny leave to amend. *Id.; see also Anderson v. USAir, Inc.*, 818 F.2d 49, 57 (D.C.Cir.1987). "Accordingly, a district court should grant a motion to amend unless there is a clear and solid justification for denying it." *Monroe*, 705 F.Supp. at 623.

The court finds that plaintiffs have been dilatory and they have unduly delayed their attempt to amend their complaint because plaintiffs were aware of the facts giving rise to the cause of action before initially filing the complaint. *See Sandcrest Outpatient Servs. v. Cumberland County Hosp. Sys. Inc.*, 853 F.2d 1139, 1149 (4th Cir.1988) (finding no abuse of discretion when the trial judge denied plaintiff's motion to amend its complaint to add a claim for injunctive relief because plaintiff was or should have been aware of this remedy from the outset). This litigation began in May of 1993. On May 27, 1993, plaintiffs filed their first complaint, 93–1054, attempting to prevent defendants from proceeding on the disciplinary charges leveled against them. Because this court denied the plaintiffs' request for temporary relief, defendants held the disciplinary hearing on the charges in July of 1993. On September 23, 1993, following the GEB's review of the hearing Panel's decision, plaintiffs filed a related action, 93–1970, seeking to prevent defendants from imposing the discipline. This complaint alleged that defendants denied plaintiffs the right to a full and fair trial under the LMRDA, and it alleged that defendants unlawfully disciplined plaintiffs. On January 27, 1994, defendants moved for summary judgment on all counts of this com-

plaint. Nearly three months after defendants had moved for summary judgment, and nearly seven months after filing their second complaint, plaintiffs made this motion to amend that complaint.

As a justification for their tardiness, plaintiffs argue that because of unfair discovery delay tactics by the defendants, plaintiffs were not aware of the "uncontroverted" evidence giving rise to this additional cause of action until December 22, 1993. This "uncontroverted" evidence to which plaintiffs refer are the ten prior opinions of the GEB that plaintiffs believe prove that the charges against plaintiffs should have been dropped when Carey did not appear in person at the hearing. However, the court finds several flaws in the plaintiffs' argument that illuminate the undue and dilatory delay in plaintiffs' motion.

First, plaintiffs seek to allege that defendants breached the IBT Constitution by (1) not dismissing the charges when Carey did not appear at the hearing,[24] and (2) allowing "involved" members adjudicate plaintiffs' guilt.[25] Plaintiffs offer no justification for not raising the second allegation when it filed its initial complaint. Plaintiffs do not contend, and the court finds that they cannot contend, that they were not aware at the time they filed this complaint in September that they may have a claim that some Panel and GEB members were impermissibly involved with the facts of the charges. The court finds that plaintiffs unduly delayed bringing this part of their breach of contract claim. See Sandcrest Outpatient Servs., 853 F.2d at 1149.

Next, plaintiffs claim that they were unaware of sufficient evidence to make their claim that Carey's absence breached the IBT Constitution in September of 1993. The court disagrees. It is undisputed that on September 20, 1993, counsel for the plaintiffs requested that defendants dismiss the charges against plaintiffs because of Carey's absence from the hearing in violation of the IBT Constitution. Plaintiffs filed the complaint at issue on September 23, 1993. That plaintiffs did not receive copies of the GEB's decisions until December does not change the fact that plaintiffs asserted this constitutional violation three months earlier.

Moreover, even if the court accepts that the plaintiffs could not have filed this claim before receiving the GEB opinions in December of 1993, this does not excuse the additional four month delay before requesting permission to amend their complaint in April of 1994. This is more significant in light of the fact that during that four month interval, defendants moved for summary judgment on all existing counts of plaintiffs' complaints. See Key Airlines, Inc. v. National Mediation Bd., 745 F.Supp. 749, 752 (D.D.C.1990) (refusing to grant leave to amend the complaint when it appeared as though the motion was an effort to avoid summary judgment).[26] In this case, if the court would grant plaintiffs' motion to amend, the defendants would be forced to supplement their summary judgment papers to address the merits of this allegation. Certainly the plaintiffs would address the issues as well. Such a delay would not be justified in this litigation. The parties have litigated this case since June of 1993; the court now refuses to allow plaintiffs to prolong it even further by recasting existing facts into a new cause of action.

The court finds that plaintiffs knew of the cause of action at the time of filing the complaint, and, even accepting as true plaintiffs' contention that they did not know of the cause of action until December of 1993, the court finds that they still were dilatory in not filing the motion to amend until April of 1994. Accordingly, plaintiffs' motion to amend shall be denied.

## IV.

## CONCLUSION

The court concludes that defendants did not deny plaintiffs their right to a full and

---

24. See IBT Constitution, art. XIX, § 2(a).

25. See IBT Constitution, art. XIX, § 1(a).

26. The court is aware that the facts in Key Airlines, Inc. clearly indicated that plaintiffs moved to amend their complaint in an effort to avoid summary judgment. However, the court finds that plaintiffs' motion to amend filed after defendants had moved for summary judgment does give rise to that same inference.

fair trial as guaranteed by the Labor Management Reporting and Disclosure Act. Many of the claims that plaintiffs raised were not part of the rights protected under the Act. Other claims simply had no merit. This case presents a difficult situation in which political opponents within the hierarchy of the IBT battled for control. Unfortunately for plaintiffs, the LMRDA does not provide a mechanism by which a federal court will substitute its own judgment for that of the IBT's judgment. Under the limited review permitted by the Act, plaintiffs' rights were protected.

Plaintiffs' respective positions as IBT officers impacts their rights under the free speech and retaliation provisions of the LMRDA. In this instance, the court finds that defendants' discipline of the plaintiffs for their violation of specific orders issued by Carey and the other defendants did not impinge upon the free speech rights of the plaintiffs. The discipline imposed removed plaintiffs from union office; it did not affect plaintiffs' membership in the union. Moreover, plaintiffs' allegation that defendants have engaged in a systematic plan to suppress dissent within the Teamsters fails for lack of specific evidence. The court does not doubt the sincerity of plaintiffs' belief that defendants have attempted to silence opposition within the IBT; however, the factual allegations and implications, even taken in a light most favorable to the plaintiffs, are insufficient to sustain their claim.

Plaintiffs' allegations directed toward Carey and his financial dealings with the IBT and the Teamster Affiliates Pension Plan must also fail. All plaintiffs claims under section 501 of the LMRDA fail because plaintiffs did not first request that the IBT bring an action against Carey. Additionally, when evaluated on the merits, these claims all fail as a matter of law. The court must also dismiss plaintiffs ERISA claim. Plaintiffs seek civil penalties; however, such penalties are only available to the Secretary of Labor. Despite ample time in which to correct this error, plaintiffs have declined to do so. Accordingly, the court shall dismiss this claim.

Plaintiffs make two final motions to preserve this litigation. First, plaintiffs argue that summary judgment would be inappropriate until plaintiffs get further discovery on the issue of Carey and his financial dealings with the IBT. Yet the court finds that even if plaintiffs could discover the facts they allege, they would not place a material issue in dispute. Second, plaintiffs move to amend their complaint, 93–1970, and add a cause of action for breach of contract. Because the plaintiffs have been dilatory and they have unduly delayed this motion, the court shall deny plaintiffs' request to amend the complaint.

The court has no doubt that plaintiffs and the Carey administration are bitter political enemies; however, plaintiffs cannot use this court avenge Carey's apparent political victory. The LMRDA does not entitle plaintiffs to require a federal court to substitute its own judgment for that of the union. Although plaintiffs obviously disagree with the IBT's disciplinary decisions, they have failed to show that any element of the union's process violated rights protected under the Act.

Accordingly, the court shall grant defendants' motion for summary judgment and shall dismiss this action in an order issued this date.

### *ORDER*

This matter comes before the court on the parties' cross-motions for summary judgment and other pending motions. For the reasons set forth in the accompanying memorandum opinion of this date, it is hereby

ORDERED that

(1) On the issue of the parties' cross-motions for summary judgment:

(a) Plaintiffs' motion to file a supplemental memorandum to their motion for summary judgment is GRANTED, defendants' motion to strike the supplemental memorandum to plaintiffs' motion for summary judgment is DENIED, and defendants' motion for leave to file a response to plaintiffs' supplemental memorandum to their motion for summary judgment is GRANTED;

(b) Defendants' motion to file a supplemental memorandum to their motion for summary judgment is GRANTED;

(c) Plaintiffs' motion for summary judgment is DENIED;

(d) Defendants' motion for summary judgment on all counts of Civil Action Number 93–1054 and Civil Action Number 93–1970 is GRANTED; the court's grant of summary judgment on count VI of Civil Action Number 93–1054 is without prejudice as dismissal is granted pursuant to Federal Rule of Civil Procedure 12(b)(6); and SUMMARY JUDGMENT is hereby entered for defendants, dismissing all other counts with prejudice;

(2) Plaintiffs' motion to amend their complaint Number 93–1970 is DENIED;

(3) On the issue of plaintiffs' motion for sanctions:

(a) Plaintiffs' motions for leave to file a supplemental memorandum, supplemental declarations, and supplemental exhibits in support of their motion for sanctions is GRANTED;

(b) Plaintiffs' motion for sanctions is DENIED;

(4) Plaintiffs' motion to compel production of documents is DENIED;

(5) Plaintiffs' motion to consolidate Civil Action Number 93–1054 and Civil Action Number 93–1970 is GRANTED; and, accordingly,

(6) SUMMARY JUDGMENT is hereby entered for defendants, dismissing both of these actions.

SO ORDERED.